Date: 1-9-2003 (Page 1) P.S. (B) [illegible]

Clerk of the Court
United States District Court
S. D. West Virginia
Charleston, West Virginia 25329

(Request Immediate Transfer to West Virginia [illegible] ...) [illegible]

Inmate & State Mental Patient Albert J. Sullivan [illegible] and United States, Etc. as Plaintiffs -V- (1) John D. Rockefeller, Jay Rockefeller, U.S. Senator (D) West Virginia and (2) Warden Stephen D. [illegible] (3) Unknown Named Mail Supervisor (4) Unknown Named Trust Fund Supervisor [See Monroe -V- Pape, 365 U.S. 167, 187 (1961) and Bivens -V- Six Unknown Named Federal Narcotics Agents, 403 U.S. 388 (1971) Carlson -V- Green, 446 U.S. 14 (1980)] (5) Major Dolores [illegible] (6) Supt. Melvin of S. [illegible] (7) Lieut. P. Hibbart (8) [illegible] (9) Nurse Karen Brady (10) J. Gennaro (11) Capt. [illegible] (12) Etc. Andrew J. [illegible] (13) [illegible] (14) [illegible] Special General [illegible] Law [illegible] [illegible] [illegible] Defendants [illegible]

[illegible] Jurisdiction, 1st Cause of Action - Independent Jurisdiction [illegible] Original Upon U.S. Const. Art. III, Section 2, et seq. and 28 U.S.C.A. § 1331 (1)(2)(3)(4) and 28 U.S.C.A. § 1343 (1)(2)(3)(4) and U.S. Const. Amends. 1st, 4th, 5th, 6th, 7th, 8th, 9th, 13th & 14th and United States as Plaintiff 28 U.S.C.A. §§ 1345 and 1348 and - (Mand. Jurisdiction) 42 U.S.C. §§ 1997 a (a), 1997 c (a)(b) [illegible] for U.S. Atty. General to Intervene for Flagrant and Egregious Conditions in State Prisons and 28 U.S.C.A. § 2403 (b) U.S. Atty. Gen. Intervention and Habeas Corpus - Jurisdiction Pursuant to 28 U.S.C. §§ 2241 through 2255 and Civil Action through 42 U.S.C. §§ 1981, 1982, 1985 (1)(2)(3) and 1988 and F.R.C.P. Rule 8(a) [illegible] Pleading

Date: 1-9-2003
Yours Very Truly
Albert J. Sullivan A01419
Albert J. Sullivan A01419
[illegible] Correctional Center
P.O. Box 99 700 W. Lincoln St.
S.M. Cell-430
Pontiac, Illinois 61764-0099

FILED
JAN 16 2003
SAMUEL L. KAY, CLERK
U.S. District & Bankruptcy Courts
Southern District of West Virginia

THIS IS A FEDERAL RULE OF CIVIL PROCEDURE RULE 56 (F) TO LEAVE AND PROCEED IN FORMA PAUPERIS ON THIS CAUSE OF ACTION AND NOT TO BE DISMISSED UNTIL FULL OR PARTIAL (DISCOVERY) TAKES PLACE PURSUANT TO: F.R.C.P. RULES E AND E 26-37 AND A NOTICE OF PLEADING UPON F.R.C.P. RULE 8 (a). AND REQUEST FOR LEAVE TO FILE AND PROCEED IN FORMA PAUPERIS PURSUANT TO: "28 U.S.C.A. § 1915 (e)(2)(B)(ii)" AND "28 U.S.C.A. § 1915(a)(2) (West Supp. 1997) Section 1915 (b)(1)(A)(B)(2)(3)(4) (West Supp. 1997): Mitchell -V- Farcass, 112 F 3d 1483 (11th Cir. 1997)

(WHEREBY (I) CLAIM (RETALIATION) FOR EXERCISING MY U.S. NATIVE BORN CONSTITUTIONAL RIGHTS (THAT) (I) AM NOW UNDER IMMINENT DANGER (OF) SERIOUS PHYSICAL INJURY AND MENTAL DAMAGES DEFINED IN: 28 U.S.C. § 1915 (g).

(I) CLAIM (THAT) DEFENDANT(S) ARE NOT IMMUNE FROM CRIMINAL (OR) CIVIL PROSECUTION AS IS DEFINED IN U.S. -V- NIXON, U.S. PRESIDENT (BE) AT 418 U.S. 683 (DECIDED JULY 24 1974) (WOLFF -V- McDONNELL, 418 U.S. 539 (1974) WILLIAM JEFFERSON CLINTON, U.S. PRESIDENT (PAULA CORBIN JONES) -- U.S. -- (1997) AND IMMUNITY FROM U.S. PRESIDENTS BUT LIMITED ONLY FROM BEING CIVILLY FROM A PRIVATE LAW SUIT (SANDERS -V- BUIA) 449 F 2d 571 (6th Cir. 1971) (FARMER -V- BRENNAN) 511 U.S. 825, 835-844 (1994).

[illegible]

Yours Very Truly, (Signed)

DATE: 1-8-2002

Albert J. Sullivan - A-01414

ALBERT J SULLIVAN - A-01414

PONTIAC CORRECTIONAL CENTER

P.O. BOX 99 - 700 W. LINCOLN ST.

S.M. - CELL - 430

PONTIAC, ILLINOIS 61764-0099

[illegible]

(B) Claim Warden [illegible] Page (4) of (6) [illegible] To Sign [illegible] (Grievance)

Illinois Department of Corrections
COMMITTED PERSON'S GRIEVANCE (Continued)

In My Main Pleading Pursuant To 28 U.S.C. § 1476 And 18 U.S.C. § 1621 That Past Four (4) Years I Have Sent Over (Several) Different Legal Documents And Legal Letters Etc. To The Below Parties On Different Occasions And As Of Yet I Have Not Received Any Type Of Acknowledgement Or Receipt From Them Which I Claimed That Numerous Of My Natural Born U.S. Constitutional Rights Have Been Violated Whether They Are A U.S. Elected Or Selected Government Official In That Being Sworn Of Oath To Protect And Defend And Uphold The U.S. Constitution. I Claim They Are Guilty Of Violating Their Oath Of Office Breach Of The Contract [illegible]

(1) George H. Ryan Ill. State Governor (2) Jesse White Illinois Secretary of State (3) Dick Durbin Ill. U.S. Senator (4) Peter Fitzgerald Ill. U.S. Senator (5) Jesse Jackson Jr. Ill. U.S. Rep. (6) U.S. Secretary of State Colin Powell (7) U.S. Surgeon General David Satcher (8) U.S. Attorney General Criminal And Civil Branch (9) U.S. F.B.I. (10) U.S. C.I.A. (11) Ill. State Speaker of House Michael Madigan (12) Ill. Sen. [illegible] (13) [illegible] (14) Kofi Annan Secretary General Of The United Nations (15) Many Of My Close Family Members And Friends (16) Various Organizations [illegible]

[illegible]

[illegible] 342 U.S. [illegible] (1952) [illegible] 396 (1974) [illegible] 75 F.2d [illegible] (1937) [illegible] 652 F.2d 868, 874 (9th Cir. 1981) [illegible] Post Master General 381 U.S. 301 (1965) [illegible] 444 U.S. 757, 762-765 (1972) [illegible] Board of Education 347 U.S. 483 (1954) [illegible] 429 U.S. [illegible] (1977) [illegible] Washington 391 U.S. 333, 334 (1968) [illegible]

ILLINOIS DEPARTMENT OF CORRECTIONS

**COMMITTED PERSON'S GRIEVANCE**

| Date: 1-8-2003 | Committed Person: (Please Print) [illegible] | ID#: [illegible] |
|---|---|---|
| Present Facility: Pontiac C.C. | Facility where grievance issue occurred: Pontiac C.C. | |

**NATURE OF GRIEVANCE:**

- ☐ Personal Property
- ☑ Mail Handling
- ☐ Restoration of Good Time
- ☐ Disability
- ☑ Staff Conduct
- ☐ Dietary
- ☐ Medical Treatment
- ☐ Other (specify) [illegible]
- ☐ Transfer Denial by Facility
- ☐ Transfer Denial by Transfer Coordinator
- ☐ Disciplinary Report: ___/___/___ Date of Report — Facility where issued: [illegible]

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:**

**Counselor,** unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
**Grievance Officer,** only if the issue involves discipline at the present facility or issue not resolved by Counselor.
**Chief Administrative Officer,** only if **EMERGENCY** grievance.
**Administrative Review Board,** only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** [illegible handwriting]

**Relief Requested:** [illegible handwriting]

☑ Check only if this is an **EMERGENCY** grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

[signature] Committed Person's Signature — [illegible] ID# — 1-8-2003 Date

(Continue on reverse side if necessary)

**Counselor's Response (if applicable)**

Date Received: ___/___/___

☐ Send directly to Grievance Officer

☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: ______________________

Print Counselor's Name — Counselor's Signature — Date of Response ___/___/___

**EMERGENCY REVIEW**

Date Received: ___/___/___

Is this determined to be of an emergency nature?

☐ Yes; expedite emergency grievance

☐ No; an emergency is not substantiated. Committed person should submit this grievance in the normal manner.

Chief Administrative Officer's Signature — Date ___/___/___

I CLAIM THE WARDEN [illegible]

[illegible] (SEE [illegible]) [illegible]

ILLINOIS DEPARTMENT OF CORRECTIONS
COMMITTED PERSON'S GRIEVANCE (Continued)

PAGE 6 OF 6

GRIEVANCE

I CLAIM THAT THE PONTIAC STATE PRISON OFFICIALS [illegible] HERE IN THIS SOUTH MENTAL BUILDING ARE [illegible] VIOLATING I.D.O.C. RULE 502 (A)(B)(C) [illegible] CLEAN HEALTHY SANITARY SAFE ENVIRONMENT FOR ME AND OTHER PRISONERS LOCATED IN THIS SOUTH MENTAL BUILDING WITH KNOWLEDGE AND WITH CRIMINAL RECKLESS DISREGARD [illegible] THE DANGER AND SERIOUS INJURY TO MYSELF AND OTHER PRISONERS HERE TO CLEAN HEALTHY FRESH AIR [illegible] SUBSTANDARD [illegible] INADEQUATE AIR VENTILATION IN MY CELL [illegible] [illegible]

[illegible]

[illegible] -V- [illegible] [illegible] -V- [illegible] [illegible] -V- [illegible] [illegible] -V- [illegible]

[illegible]

[illegible] 365 U.S. 167, 187 (1961)

JACKSON -V- BISHOP, 404 F.2d 571 (8th Cir. 1968)

HELLING -V- MCKINNEY, 509 U.S. 25 (1993)

FARMER -V- BRENNAN, 511 U.S. 825, 835-846 (1994)

[illegible]

EXHIBIT PAGE 5 (126)

ILLINOIS DEPARTMENT OF CORRECTIONS
COMMITTED PERSON'S GRIEVANCE

| Date: 1-7-2003 | Committed Person: (Please Print) Albert S. [illegible] | ID#: A01414 |
|---|---|---|
| Present Facility: Pontiac C.C. | Facility where grievance issue occurred: Pontiac C.C. | |

**NATURE OF GRIEVANCE:**

- [x] Personal Property
- [x] Mail Handling
- [ ] Restoration of Good Time
- [x] Disability
- [x] Staff Conduct
- [ ] Dietary
- [x] Medical Treatment
- [x] Other (specify): [illegible]
- [ ] Transfer Denial by Facility
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Disciplinary Report: ___/___/___ Date of Report ______ Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:**

**Counselor,** unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
**Grievance Officer,** only if the issue involves discipline at the present facility or issue not resolved by Counselor.
**Chief Administrative Officer,** only if EMERGENCY grievance.
**Administrative Review Board,** only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** [illegible handwriting]

**Relief Requested:** [illegible handwriting]

- [x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Albert [illegible] — Committed Person's Signature | A01414 — ID# | 1/8/2003 — Date

(Continue on reverse side if necessary)

**Counselor's Response (if applicable)**

Date Received: ___/___/___  [ ] Send directly to Grievance Officer  [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: ______

Print Counselor's Name ______ Counselor's Signature ______ Date of Response ___/___/___

**EMERGENCY REVIEW**

Date Received: ___/___/___  Is this determined to be of an emergency nature?  [ ] Yes; expedite emergency grievance  [ ] No; an emergency is not substantiated. Committed person should submit this grievance in the normal manner.

Chief Administrative Officer's Signature ______ Date ___/___/___

surprising, therefore, that subsequent to its decision in this case the Alabama Court of Civil Appeals held that a claim identical to appellant's would not be considered, where the husband raised it for the first time on a motion for a new trial. *Hughes v. Hughes*, 362 So.2d 910, cert. dismissed as improvidently granted, 362 So.2d 918 (Ala.1978), appeal docketed, No. 78-1071. This holding should apply *a fortiori* to a case where the constitutional claim was not raised until a contempt proceeding.

The second question of state law concerns the formal settlement agreement entered into between appellant and appellee, which deals in detail with the "property rights, alimony, and [440 U.S. 287] other matters in dispute" between ***1116** the parties, and which was approved by the divorce court. The agreement requires the husband to pay $1,240 per month for the "support and maintenance, use and comfort" of the wife for her life or until she remarries. It also specifies that the terms and provisions of the agreement "shall inure to and be binding upon the parties hereto and their respective heirs, assigns, executors, administrators and legal representatives." App. 7-15. Although the Court does not view this agreement as any obstacle to reaching the constitutional question, it does acknowledge that appellant "may have a continuing obligation to his former wife based upon that agreement"--as a matter of "state contract law" quite apart from the divorce decree. *Ante*, at 1109-1110.

If appellant's collateral attack on the terms of the divorce decree could not properly be entertained under Alabama law, or if the alimony obligation assumed by appellant in the settlement agreement remains enforceable under Alabama law, the question whether this Court constitutionally may exercise jurisdiction over the dispute would be close and difficult. (FN1) In addition, it would be unnecessary to consider the constitutionality of Alabama's divorce statute, as the adequate-and-independent-state-ground doctrine then would bar federal review of the judgment against appellant. (FN2)

[440 U.S. 288] The Court, in order to find a case or controversy present here, necessarily assumes the answer to both of the state-law questions in this case. In some circumstances such assumptions might be appropriate. We cannot anticipate every state-law issue that ultimately could bar the realization of an otherwise substantial federal claim, and the failure of either the state courts or the parties to address an issue ordinarily might indicate that it does not present a problem. But here the Court concedes the substantiality of the identified but unanswered questions. Indeed, in light of *Hughes v. Hughes*, *supra*, it could not do otherwise.

The uncertainty and ambiguity surrounding this case is accentuated by the fact that appellant apparently does not contend that the entire divorce decree is invalid; he seeks relief only from so much of the decree as imposes an alimony obligation. But this obligation is only one element of the detailed and comprehensive agreement signed by the parties and witnessed by their respective attorneys. The agreement was not made subject to the approval of the divorce court. Apart from whether the contractual obligation to pay alimony remains binding on appellant, is there a question as to the binding effect of the divorce itself upon appellee? Would she have agreed to divorce appellant without a contest, and without making a record of her grounds for divorce, unless she had the assurance of a valid and enforceable court order providing support and maintenance for her lifetime?

Apparently none of these questions was raised in either of the Alabama courts. No explanation has been offered us as to why the case is presented here in this manner. (FN3) In view of [440 U.S. 289] the substantiality of the unanswered questions, it must be conceded that ***1117** serious doubts exist as to either the presence of a judicially cognizable case or controversy or to appellant's obtaining any advantage from his constitutional claim. The failure of the parties to raise the questions in the courts below, and of the courts to raise them *sua sponte*, cannot bind us. On the record before us it cannot be said with assurance that the interests of these parties before this Court are fully adversary or that they are not seeking--for reasons undisclosed--a purely advisory opinion on a constitutional issue of considerable importance. (FN4)

In these circumstances, I find the Court's insistence upon reaching and deciding the merits quite irreconcilable with the long-established doctrine that we abstain from reaching a federal constitutional claim that is premised on unsettled questions of state law without first affording the state courts [440 U.S. 290] an opportunity to resolve such questions. I therefore would remand the case to the Supreme Court of Alabama.

Mr. Justice REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

In Alabama only wives may be awarded alimony

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*1197 109 S.Ct. 1197

489 U.S. 378, 103 L.Ed.2d 412, 57 USLW 4270

Supreme Court of the United States

**CITY OF CANTON, OHIO, Petitioner**
**v.**
**Geraldine HARRIS et al.**

**No. 86-1088.**
Argued Nov. 8, 1988.

Decided Feb. 28, 1989.

Detainee brought civil rights action against city, alleging violation of her right to receive necessary medical attention while in police custody. The United States District Court for the Northern District of Ohio entered judgment in favor of detainee, and city appealed. The Court of Appeals, 6th Circuit, 798 F.2d 1414, unpublished opinion, reversed and remanded, and city petitioned for writ of certiorari. The Supreme Court, Justice White, held that inadequacy of police training may serve as basis for § 1983 municipal liability only where failure to train amounts to deliberate indifference to rights of persons with whom police come into contact.

Vacated and remanded.

Justice Brennan filed concurring opinion.

Justice O'Connor filed opinion concurring in part and dissenting in part in which Justice Scalia and Justice Kennedy joined.

West Headnotes

[1] Civil Rights 🔑206(4)

78 ----
78II Federal Remedies
78II(B) Civil Actions
78II(B)1 In General
78k204 Persons Liable
78k206 Municipalities and Other Governmental Bodies
78k206(2) Acts of Officers and Employers; Respondeat Superior
78k206(4) Lack of Control, Training, or Supervision; Knowledge and Inaction.

(Formerly 78k13.7)

Under certain circumstances, municipality can be held liable in civil rights action under § 1983 for constitutional violations resulting from its failure to train municipal employees. 42 U.S.C.A. § 1983.

[2] Federal Courts 🔑452

170B ----
170BVII Supreme Court
170BVII(B) Review of Decisions of Courts of Appeals
170Bk452 Certiorari in General.

[See headnote text below]

[2] Federal Courts 🔑461

170B ----
170BVII Supreme Court
170BVII(B) Review of Decisions of Courts of Appeals
170Bk460 Review on Certiorari
170Bk461 Questions Not Presented Below or in Petition for Certiorari.

Writ of certiorari issued pursuant to city's petition seeking review of decision holding it liable in civil rights action for failing to train police officers when to summon medical care for injured detainees would not be dismissed as improvidently granted, despite detainee's claim that city failed to preserve principal issues for review; city's petition directly addressed issue of circumstances under which inadequate training could be found to be "policy" that is actionable in civil rights action, and detainee's brief in opposition of petition did not contend that city's claims were not pressed on appeal. 42 U.S.C.A. § 1983.

[3] Civil Rights 🔑206(3)

78 ----
78II Federal Remedies
78II(B) Civil Actions
78II(B)1 In General
78k204 Persons Liable
78k206 Municipalities and Other Governmental Bodies
78k206(2) Acts of Officers and Employers; Respondeat Superior
78k206(3) Governmental Ordinance, Policy, Practice, or Custom.

(Formerly 78k13.7)

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

First inquiry in any case alleging municipal liability under § 1983 is question of whether there is direct causal link between municipal policy or custom and alleged constitutional deprivation. 42 U.S.C.A. § 1983.

[4] Federal Courts 🔑461

170B ----
170BVII Supreme Court
170BVII(B) Review of Decisions of Courts of Appeals
170Bk460 Review on Certiorari
170Bk461 Questions Not Presented Below or in Petition for Certiorari.

Issue of whether city could be held liable for its alleged "custom" of denying medical care to detainees suffering from emotional or medical ailments would not be considered by Supreme Court on writ of certiorari from Court of Appeals' decision ruling that city could be held liable for failing to adequately train police officers, where "custom" claim was not passed on by Court of Appeals, and was not presented to that Court as distinct ground for decision. 42 U.S.C.A. § 1983.

[5] Civil Rights 🔑206(4)

78 ----
78II Federal Remedies
78II(B) Civil Actions
78II(B)1 In General
78k204 Persons Liable
78k206 Municipalities and Other Governmental Bodies
78k206(2) Acts of Officers and Employers; Respondeat Superior
78k206(4) Lack of Control, Training, or Supervision; Knowledge and Inaction.

(Formerly 78k13.7)

There are limited circumstances in which allegation of "failure to train" can be basis for municipal liability under § 1983; not only unconstitutional policies are actionable under the statute. 42 U.S.C.A. § 1983.

[6] Civil Rights 🔑206(4)

78 ----
78II Federal Remedies
78II(B) Civil Actions
78II(B)1 In General
78k204 Persons Liable
78k206 Municipalities and Other Governmental Bodies
78k206(2) Acts of Officers and Employers; Respondeat Superior
78k206(4) Lack of Control, Training, or Supervision; Knowledge and Inaction.

(Formerly 78k13.7)

Inadequacy of police training may serve as basis for § 1983 municipal liability only where failure to train amounts to deliberate indifference to rights of persons with whom police come into contact; only where municipality's failure to train its employees in relevant respect evidences "deliberate indifference" to rights of its inhabitants can such shortcoming be properly thought of as city "policy or custom" that is actionable under § 1983. 42 U.S.C.A. § 1983.

[7] Civil Rights 🔑206(1)

78 ----
78II Federal Remedies
78II(B) Civil Actions
78II(B)1 In General
78k204 Persons Liable
78k206 Municipalities and Other Governmental Bodies
78k206(1) In General.

(Formerly 78k13.7)

Proper standard for determining when municipality will be liable under § 1983 for constitutional wrongs does not turn on any underlying culpability test that determines when such wrongs have occurred. 42 U.S.C.A. § 1983.

[8] Civil Rights 🔑206(4)

78 ----
78II Federal Remedies
78II(B) Civil Actions
78II(B)1 In General
78k204 Persons Liable
78k206 Municipalities and Other Governmental Bodies
78k206(2) Acts of Officers and Employers; Respondeat Superior
78k206(4) Lack of Control, Training, or Supervision; Knowledge and Inaction.

(Formerly 78k13.7)

In resolving issue of city's liability for failing to

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*1468 100 S.Ct. 1468

446 U.S. 14, 64 L.Ed.2d 15

Supreme Court of the United States

**Norman A. CARLSON, Director, Federal Bureau of Prisons, et al., Petitioners,**
**v.**
**Marie GREEN, Administratrix of the Estate of Joseph Jones, Jr.**

**No. 78-1261.**
Argued Jan. 7, 1980.

Decided April 22, 1980.

Suit was brought by administratrix of estate of deceased federal prisoner alleging that prison officials violated prisoner's due process, equal protection and Eighth Amendment rights. The United States District Court for the Southern District of Indiana, James E. Noland, J., dismissed complaint, and administratrix appealed. The Court of Appeals for the Seventh Circuit, 581 F.2d 669, reversed and remanded, and certiorari was granted. The Supreme Court, Mr. Justice Brennan, held that: (1) a remedy was available directly under the Constitution to the administratrix even though her allegations could also support a suit against the United States under the Federal Tort Claims Act, and (2) survival of administratrix's *Bivens* cause of action was governed by federal common law rather than by state statutes.

Affirmed.

Mr. Justice Powell filed an opinion concurring in the judgment in which Mr. Justice Stewart joined.

Mr. Chief Justice Burger and Mr. Justice Rehnquist filed dissenting opinions.

West Headnotes

[1] Federal Courts 461

170B ----
170BVII Supreme Court
170BVII(B) Review of Decisions of Courts of Appeals
170Bk460 Review on Certiorari
170Bk461 Questions Not Presented Below or in Petition for Certiorari.

Though Supreme Court does not normally decide issues that are not presented below, it is not precluded from doing so.

[2] Federal Courts 461

170B ----
170BVII Supreme Court
170BVII(B) Review of Decisions of Courts of Appeals
170Bk460 Review on Certiorari
170Bk461 Questions Not Presented Below or in Petition for Certiorari.

Where issue was clearly presented and fully briefed, although it had not been presented in either the district court or the Court of Appeals, and issue was important, recurring one that was properly raised in another petition for certiorari, interests of judicial administration were served by addressing issue on its merits.

[3] Action 2

13 ----
13I Grounds and Conditions Precedent
13k2 Acts or Omissions Constituting Causes of Action in General.

*Bivens* cause of action against federal agent for constitutional violation, despite absence of any statute conferring such a right, may be defeated when defendants demonstrate special factors counselling hesitation in absence of affirmative action by Congress, or when defendants show that Congress has provided alternative remedy which is explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective.

[4] Prisons 10

310 ----
310k5 Officers
310k10 Liabilities in General.

Where federal prison officials did not enjoy such independent status as to suggest that judicially created remedies against them might be inappropriate, where qualified immunity accorded them provided adequate protection for their efforts to perform their official duties, where there was no explicit congressional declaration that persons injured by officers' violations of the Eighth Amendment had to be remitted to another remedy, and where Congress contemplated existence of action under Federal Tort Claims Act

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

against United States as well as *Bivens* action against individual officials, remedy was available directly under the Constitution to administratrix of federal prisoner's estate for prison officials' violations of prisoner's Eighth Amendment rights even though her allegations would also support suit under the Federal Tort Claims Act. 28 U.S.C.A. § 2680(h); U.S.C.A.Const. Amend. 8.

[5] United States ⚿50.10(3)

393 ----
393I Government in General
393k50 Liabilities of Officers or Agents for Negligence or Misconduct
393k50.10 Particular Acts or Claims
393k50.10(3) Criminal Law Enforcement and Investigation; Prisoners' Claims.

(Formerly 393k50)

Since *Bivens* remedy is more effective deterrent than Federal Tort Claims Act remedy inasmuch as it is recoverable against individuals, since punitive damages may be awarded in a *Bivens* suit, while statutorily prohibited in a FTCA suit, since a plaintiff cannot opt for a jury in a FTCA action as he may in a *Bivens* suit, and since FTCA action exists only when state in which misconduct occurred would permit cause of action for that misconduct to go forward, administratrix of prisoner's estate, who alleged that prisoner suffered injuries from which he died because federal prison officials violated his Eighth Amendment rights, was not relegated exclusively to FTCA remedy. 28 U.S.C.A. §§ 1346(b), 2680(h); U.S.C.A.Const. Amend. 8.

[6] Federal Courts ⚿401

170B ----
170BVI State Laws as Rules of Decision
170BVI(C) Application to Particular Matters
170Bk401 Abatement and Revival.

*Bivens* actions, in which the victim of a constitutional violation by federal agent has right to recover damages against official in federal court despite absence of any statute conferring such a right, are creations of federal law and thus question whether action brought by administratrix of estate of federal prisoner, who alleged that federal prison officials violated prisoner's Eighth Amendment rights, survived prisoner's death was question of federal law; only uniform federal rule of survivorship would suffice to redress alleged constitutional deprivation and protect against repetition of such conduct. U.S.C.A.Const. Amend. 8.

[7] Federal Courts ⚿401

170B ----
170BVI State Laws as Rules of Decision
170BVI(C) Application to Particular Matters
170Bk401 Abatement and Revival.

Whenever the relevant state survival statute would abate a *Bivens* -type action, in which the victim of a constitutional violation by federal official has a right to recover damages against official in federal court despite absence of any statute conferring such a right, brought against defendants whose conduct resulted in death, federal common law allows survival of the action.

**1469 Syllabus* (FN*)

Respondent brought suit in Federal District Court in Indiana on behalf of her deceased son's estate, alleging that her son while a prisoner in a federal prison in Indiana suffered personal injuries from which he died because petitioner prison officials violated, *inter alia*, his Eighth Amendment rights by failing to give him proper medical attention. Asserting jurisdiction under 28 U.S.C. § 1331(a), respondent claimed compensatory and punitive damages. The District Court held that the allegations pleaded a violation of the Eighth Amendment's proscription against cruel and unusual punishment, thus giving rise to a cause of action for damages under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, under which it was established that victims of a constitutional violation by a federal official have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right. But the court dismissed the complaint on the ground that, although the decedent could have maintained the action if he had survived, the damages remedy as a matter of federal law was limited to that provided by Indiana's survivorship and wrongful-death laws, which the court construed as making the damages available to the decedent's estate insufficient to meet § 1331(a)'s $10,000 jurisdictional-amount requirement. While otherwise agreeing with the District Court, the Court of Appeals held that the latter requirement was satisfied because whenever a state survivorship statute would abate a *Bivens* -type action, the federal common law allows survival of the action.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*Held:*

1. A *Bivens* remedy is available to respondent even though the allegations could also support a suit against the United States under the Federal Tort Claims Act (FTCA). Pp. 1471-1474.

(a) Neither of the situations in which a cause of action under *Bivens* may be defeated are present here. First, the case involves no special factors counseling hesitation in the absence of affirmative action by Congress, petitioners not enjoying such independent status in our [446 U.S. 15] constitutional scheme as to suggest that judicially created remedies against them might be inappropriate. Second, there is no explicit congressional declaration that persons injured by *1470 federal officers' violations of the Eighth Amendment may not recover damages from the officers but must be remitted to another remedy, equally effective in Congress' view. There is nothing in the FTCA or its legislative history to show that Congress meant to pre-empt a *Bivens* remedy or to create an equally effective remedy for constitutional violations. Rather, in the absence of a contrary expression from Congress, the FTCA's provision creating a cause of action against the United States for intentional torts committed by federal law enforcement officers, contemplates that victims of the kind of intentional wrongdoing alleged in the complaint in this case shall have an action under the FTCA against the United States as well as a *Bivens* action against the individual officials alleged to have infringed their constitutional rights. Pp. 1471-1472.

(b) The following factors also support the conclusion that Congress did not intend to limit respondent to an FTCA action: (i) the *Bivens* remedy, being recoverable against individuals, is a more effective deterrent than the FTCA remedy against the United States; (ii) punitive damages may be awarded in a *Bivens* suit, but are statutorily prohibited in an FTCA suit; (iii) a plaintiff cannot opt for a jury trial in an FTCA action as he may in a *Bivens* suit; and (iv) an action under the FTCA exists only if the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward. Pp. 1472-1474.

2. Since *Bivens* actions are a creation of federal law, the question whether respondent's action survived her son's death is a question of federal law. Only a uniform federal rule of survivorship will suffice to redress the constitutional deprivation here alleged and to protect against repetition of such conduct. *Robertson v. Wegmann*, 436 U.S. 584, distinguished. Pp. 1474-1475.

581 F.2d 669 (7th Cir.), affirmed.

Kenneth S. Geller, Washington, D. C., for petitioners.

[446 U.S. 16] Michael E. Deutsch, Chicago, Ill., for respondent.

Mr. Justice BRENNAN delivered the opinion of the Court.

[1][2] Respondent brought this suit in the District Court for the Southern District of Indiana on behalf of the estate of her deceased son, Joseph Jones, Jr., alleging that he suffered personal injuries from which he died because the petitioners, federal prison officials, violated his due process, equal protection, and Eighth Amendment rights. (FN1) Asserting jurisdiction under 28 U.S.C. § 1331(a), she claimed compensatory and punitive damages for the constitutional violations. Two questions are presented for decision: (1) Is a remedy available directly under the Constitution, given that respondent's allegations could also support a suit against the United States [446 U.S. 17] under the Federal Tort Claims Act? (FN2) And (2) if so, is survival of the cause *1471 of action governed by federal common law or by state statutes?

I

The District Court held that under *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the allegations set out in note 1, *supra*, pleaded a violation of the Eighth Amendment's proscription against infliction of cruel and unusual punishment, (FN3) giving rise to a cause of action for damages under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The court recognized that the decedent could have maintained this action if he had survived, but dismissed the complaint because in its view the damages remedy as a matter of federal law was limited to that provided by Indiana's survivorship and wrongful-death laws and, as the court construed those laws, the damages available to Jones' estate failed to meet § 1331(a)'s $10,000 jurisdictional-amount requirement. The Court of Appeals for the Seventh Circuit agreed that an Eighth Amendment violation was pleaded under *Estelle* and that a cause of action was stated under *Bivens*, but reversed the holding that § 1331(a)'s jurisdictional-amount requirement was not met. (FN4) Rather, the Court of

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Appeals held that [446 U.S. 18] § 1331(a) was satisfied because "whenever the relevant state survival statute would abate a *Bivens* -type action brought against defendants whose conduct results in death, the federal common law allows survival of the action." 581 F.2d 669, 675 (1978). The court reasoned that the Indiana law, if applied, would "subvert" "the policy of allowing complete vindication of constitutional rights" by making it "more advantageous for a tortfeasor to kill rather than to injure." *Id.*, at 674. We granted certiorari. 442 U.S. 940, 99 S.Ct. 2880, 61 L.Ed.2d 309 (1979). We affirm.

II

[3] *Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right. Such a cause of action may be defeated in a particular case, however, in two situations. The first is when defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress." 403 U.S., at 396, 91 S.Ct., at 2004; *Davis v. Passman*, 442 U.S. 228, 245, 99 S.Ct. 2264, 2277, 60 L.Ed.2d 846 (1979). The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly [446 U.S. 19] under the Constitution and viewed as equally effective. *Bivens, supra*, at 397, 91 S.Ct., at 2005; *Davis v. Passman, supra*, at 245-247, 99 S.Ct., at 2277-2278.

*1472 [4] Neither situation obtains in this case. First, the case involves no special factors counselling hesitation in the absence of affirmative action by Congress. Petitioners do not enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against them might be inappropriate. *Davis v. Passman, supra*, at 246, 99 S.Ct., at 2277. Moreover, even if requiring them to defend respondent's suit might inhibit their efforts to perform their official duties, the qualified immunity accorded them under *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), provides adequate protection. See *Davis v. Passman, supra*, at 246, 99 S.Ct., at 2277.

Second, we have here no explicit congressional declaration that persons injured by federal officers' violations of the Eighth Amendment may not recover money damages from the agents but must be remitted to another remedy, equally effective in the view of Congress. Petitioners point to nothing in the Federal Tort Claims Act (FTCA) or its legislative history to show that Congress meant to pre-empt a *Bivens* remedy or to create an equally effective remedy for constitutional violations. (FN5) FTCA was enacted long before *Bivens* was decided, but when Congress amended FTCA in 1974 to create a cause of action against the United States for intentional torts committed by federal law enforcement officers, 28 U.S.C. § 2680(h), the congressional comments accompanying [446 U.S. 20] that amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action:

> "[A]fter the date of enactment of this measure, innocent individuals who are subjected to raids [like that in *Bivens* ] will have a cause of action against the individual Federal agents *and* the Federal Government. Furthermore, this provision should be viewed as a *counterpart* to the *Bivens* case and its progenty [*sic* ], in that it waives the defense of sovereign immunity so as to make the Government independently liable in damages for the same type of conduct that is alleged to have occurred in *Bivens* (and for which that case imposes liability upon the individual Government officials involved)." S.Rep.No.93-588, p. 3 (1973) (emphasis supplied).

In the absence of a contrary expression from Congress, § 2680(h) thus contemplates that victims of the kind of intentional wrongdoing alleged in this complaint shall have an action under FTCA against the United States as well as a *Bivens* action against the individual officials alleged to have infringed their constitutional rights.

This conclusion is buttressed by the significant fact that Congress follows the practice of explicitly stating when it means to make FTCA an exclusive remedy. See 38 U.S.C. § 4116(a), 42 U.S.C. § 233(a), 42 U.S.C. § 2458a, 10 U.S.C. § 1089(a), and 22 U.S.C. § 817(a) (malpractice by certain Government health personnel); 28 U.S.C. § 2679(b) (operation of motor vehicles by federal employees); and 42 U.S.C. § 247b(k) (manufacturers of swine flu vaccine). Furthermore, Congress has not taken action on other bills that would expand the exclusivity of FTCA. See, *e. g.*, S.695, 96th Cong., 1st Sess. (179); H.R.2659, 96th Cong., 1st Sess. (1979); S.3314, 95th Cong., 2d Sess. (1978).

[5] Four additional factors, each suggesting that the *Bivens* remedy is more effective than the FTCA remedy, also support our conclusion that Congress did not intend to limit respondent[446 U.S. 21] to an

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

FTCA action. First, the *Bivens* remedy, in addition to compensating victims, serves a deterrent *1473 purpose. See*Butz v. Economou, supra*, at 505, 98 S.Ct., at 2910. (FN6) Because the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy against the United States. It is almost axiomatic that the threat of damages has a deterrent effect, (FN7) *Imbler v. Pachtman*, 424 U.S. 409, 442, 96 S.Ct. 984, 1000, 47 L.Ed.2d 128 (1976) (WHITE, J., concurring in judgment), surely particularly so when the individual official faces personal financial liability.

Petitioners argue that FTCA liability is a more effective deterrent because the individual employees responsible for the Government's liability would risk loss of employment (FN8) and because the Government would be forced to promulgate corrective policies. That argument suggests, however, that the superiors would not take the same actions when an employee is found personally liable for violation of a citizen's constitutional rights. The more reasonable assumption is that responsible superiors are motivated not only by concern for the public fisc but also by concern for the Government's integrity.

Second, our decisions, although not expressly addressing [446 U.S. 22] and deciding the question, indicate that punitive damages may be awarded in a *Bivens* suit. Punitive damages are "a particular remedial mechanism normally available in the federal courts," *Bivens*, 403 U.S., at 397, 91 S.Ct., at 2005, and are especially appropriate to redress the violation by a Government official of a citizen's constitutional rights. Moreover, punitive damages are available in "a proper" § 1983 action, *Carey v. Piphus*, 435 U.S. 247, 257, n. 11, 98 S.Ct. 1042, 1049, n. 11, 55 L.Ed.2d 252 (1978) (punitive damages not awarded because District Court found defendants "did not act with a malicious intention to deprive respondents of their rights or to do them other injury"), (FN9) and *Butz v. Economou*, suggests that the "constitutional design" would be stood on its head if federal officials did not face at least the same liability as state officials guilty of the same constitutional transgression. 438 U.S., at 504, 98 S.Ct., at 2910. But punitive damages in an FTCA suit are statutorily prohibited. 28 U.S.C. § 2674. Thus FTCA is that much less effective than a *Bivens* action as a deterrent to unconstitutional acts.

Third, a plaintiff cannot opt for a jury in an FTCA action, 28 U.S.C. § 2402, as he may in a *Bivens* suit. (FN10) Petitioners argue *1474 that this is an irrelevant difference because juries have been biased against *Bivens* claimants. Reply Brief for Petitioners 7, and n. 6; Brief for Petitioners 30-31, n. 30. Significantly, however, they do not assert that judges trying the claims as FTCA actions would have been more receptive, and [446 U.S. 23] they cannot explain why the plaintiff should not retain the choice.

Fourth, an action under FTCA exists only if the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward. 28 U.S.C. § 1346(b) (United States liable "in accordance with the law of the place where the act or omission occurred"). Yet it is obvious that the liability of federal officials for violations of citizens' constitutional rights should be governed by uniform rules. See Part III, *infra*. The question whether respondent's action for violations by federal officials of federal constitutional rights should be left to the vagaries of the laws of the several States admits of only a negative answer in the absence of a contrary congressional resolution.

Plainly FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy.

III

[6] *Bivens* actions are a creation of federal law and, therefore, the question whether respondent's action survived Jones' death is a question of federal law. See *Burks v. Lasker*, 441 U.S. 471, 476, 99 S.Ct. 1831, 1836, 60 L.Ed.2d 404 (1979). Petitioners, however, would have us fashion a federal rule of survivorship that incorporates the survivorship laws of the forum State, at least where the state law is not inconsistent with federal law. Respondent argues, on the other hand, that only a uniform federal rule of survivorship is compatible with the goal of deterring federal officials from infringing federal constitutional rights in the manner alleged in respondent's complaint. We agree with respondent. Whatever difficulty we might have resolving the question were the federal involvement less clear, we hold that only a uniform federal rule of survivorship will suffice to redress the constitutional deprivation here alleged and to protect against repetition of such conduct.

[446 U.S. 24] [7] In short, we agree with and adopt the reasoning of the Court of Appeals, 581 F.2d, at 674-675 (footnote omitted):

(FN6.) There is a further irony. While Missouri ostensibly does not have sufficient resources to permit and screen inmate-to-inmate mail, Kansas apparently lacks sufficient resources to ban it. Ms. Halford testified that open correspondence was not abrogated in the Kansas correctional system despite security concerns because her superiors felt that it was "too much of an effort to restrict it, that it tied up staff to send out all forms to the various and sundry institutions. So I think we're all basically in agreement that even though it is a problem to have open correspondence, the reason that we don't do it is simply staff time." 3 *id.*, at 168.

(FN7.) "Q. Those inmates who are allowed to write, you do not find it necessary to stop their correspondence as a matter of course; isn't that true?

"A. No, we don't stop it as a matter of course and we don't authorize it as a matter of course. There is no carte blanche approval or denial at any facility. It is done on a case by case individual basis and would have to be.

"Q. Let me refer specifically to inmate-to-inmate. Are you saying there is no carte blanche denial of inmate-to-inmate or the inmates aren't told that at Renz Correctional Center?

"A. The Division policy is not carte blanche [to] deny inmate-to-inmate, or to approve it." 4 *id.*, at 43.

(FN8.) "Q. You do know that is the rule at Renz that they cannot write to other institutions unless the inmate is a relative?

"A. I am not certain that that is the rule, no.

"Q. Let me hand you Plaintiffs' Exhibit B, excuse me, Defendants' Exhibit B. I don't have the plaintiffs' number. This is in evidence. It is the inmate orientation manual, February 1983. I direct your attention to the paragraph that says correspondence with inmates of other institutions is permitted with immediate family members only.

"Now, were you familiar with that being the policy at Renz Correctional Center?

"A. I am not sure if I was specifically or not." *Id.*, at 44.

(FN9.) At the time of trial, the Renz Correctional Center contained both male and female prisoners of varying security level classifications. Most of the female inmates were medium and maximum security offenders, while most of the male inmates were minimum security offenders. 777 F.2d 1307, 1308 (CA8 1985).

***2275**_ (FN10.) "Q. The question was do you realize the plaintiffs in this case accept the rights of the Division of Corrections to read all their mail if the Division wants to?

"A. There is no way we can read all the mail nor would we want to." 4 Tr. 41.

"Q. Let me hand you Exhibit No. 3, sir, the mail and visiting rule for the Department of Corrections, specifically concerning inmate mail signed by you.

"I direct your attention to paragraph 1(C), outgoing letters will not be sealed by the inmate. And further down in the paragraph, all letters may be inspected in the mail room and examined for contraband, escape plots, forgery, fraud, and other schemes.

"Now, tell me, sir, how do you examine a letter for an escape plot without reading it?

"A. We do not read mail. This does not say mail will be read. The only time we read a letter is when we have reason to believe, for example, that an escape is being planned. [W]hen a letter is being planned, there is no way we want to or know to read all inmate mail. It is impossible." *Id.*, at 42-43.

There was no record indication of the amount of correspondence between inmates that would occur if it were permitted. Mr. Blackwell stated only that in his opinion, "if we do allow inmates to write other inmates pretty much at will, the vast majority will be writing one another, at least one other offender in another institution. I think it is obvious what it will do to mail room load." *Id.*, at 108.

(FN11.) "[I]n Kansas we have, our rules and regulations allow us to read all incoming mail. Due to the volume of mail that is absolutely impossible to do." 3 *id.*, at 159.

(FN12.) The average population at Renz in the 1983 fiscal year was 270. See American Correctional Assn., Juvenile and Adult Correctional Departments, Institutions, Agencies, and Paroling Authorities 214 (1984).

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

When Ms. Halford was asked why the prison officials did not read all of the inmate mail, she gave this response:

"A. To begin with it's very boring reading. Another thing, I think it's a poor use of staff time. If I get more staff in, I would like to have them doing something more important than reading inmate mail. That seems to me to be kind of a waste of time." Tr. 176.

Earl Englebrecht testified that at Renz he scanned the contents of all approved incoming mail from other institutions, and that this task and scanning some outgoing mail together took approximately one hour a day. 5 *id.*, at 97, 99. He could not indicate with any certainty the additional screening burden that more frequent inmate-to-inmate correspondence would impose on him and on the mail room. *Id.*, at 102. The testimony of these two witnesses is hardly consistent with the Court's assumption that it would be "impossible" to read the portion of the correspondence that is addressed to, or received from, inmates in other institutions.

(FN13.) The Court's speculation, *ante,* at 2261, 2263, about the ability of prisoners to use codes is based on a suggestion in an *amicus curiae* brief, see Brief for State of Texas as *Amicus Curiae* 7-9, and is totally unsupported by record evidence.

(FN14.) See ABA Standards for Criminal Justice 23-6.1, Commentary, p. 23-76 (2d ed. 1980) ("[P]risoners can write at any length they choose, using any language they desire, to correspondents of their selection, including present or former prisoners, with no more controls than those which govern the public at large"). The American Correctional Association has set forth the "current standards deemed appropriate by detention facility managers and recognized organizations representing corrections." ACA, Standards for Adult Local Detention Facilities xiii (2d ed. 1981). Standard 2-5328 requires clear and convincing evidence to justify "limitations for reasons of public safety or facility order and security" on the volume, "length, language, content or source" of mail which an inmate may send or receive. *Id.*, at 88.

(FN15.) The Court's bifurcated treatment of the mail and marriage regulations leads to the absurd result that an inmate at Renz may marry another inmate, but may not carry on the courtship leading to the marriage by corresponding with him or her beforehand because he or she would not then be an "immediate family member."

***2275_** (FN16.) Explaining why the request of inmate Diana Finley to be married to inmate William Quillam was denied, Superintendent Turner stated: "If he gets out, then we have got some security problems.... The threat, if a man gets out of the penitentiary and he is married to her and he wants his wife with him, there is very little that we can do to stop an escape from that institution because we don't have the security, sophisticated security, like a maximum security institution." 1 Tr. 185-186. See also *id.*, at 187.

(FN17.) One of Superintendent Turner's articulated reasons for preventing one female inmate from corresponding with a male inmate closely tracks the "love triangle" rationale advanced for the marriage regulation:

"Q: Let's take Ms. Flowers. Do you know of any reason why she should not be allowed to write to Mr. Barks?

"A: Yes.

"Q: Why?

"A: She has two other men. One she wants to get married to, another man that she was involved with at Renz resides with Mr. Barks.

"Q: Let me ask you this. You have mentioned on two or three occasions that people want to get married to one man or the other. Is it your understanding that the only possible relationship between a woman and a man is one of intending to get married?

"A: Well, when they speak of love and want to marry two people, I think that one of them is going to be cut short." *Id.*, at 237-238.

The Superintendent later elaborated on redirect examination:

"Q: Now you have given an example of a problem that in your opinion justifies restrictions on correspondence as being, say, two men who were corresponding with a particular woman. Would it also be possible to call the two men in and have a chat with them in your office and try to resolve that between them?

"A: I don't see where that is necessary in my

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

however, it is clear that he cannot claim [449 U.S. 21] the prison officials acted out of bad faith or on mere pretext. Their ***182** decision to remove him from the general prison population was "rationally related to the reasonable, indeed to the central, objectives of prison administration," *Jones v. North Carolina Prisoners' Labor Union supra*, 433 U.S., at 129, 97 S.Ct., at 2539.

Indeed, it is difficult to envision exactly how an intoxicated inmate would participate in any meaningful way in a hearing held immediately after the drinking incident. A strong argument could certainly be advanced that it would have been a violation of petitioner's rights to hold a hearing when he was, as he admitted, drunk.

This case is thus like *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), where we held that no constitutional violation occurred when an untenured employee was discharged without a hearing. No hearing was required to permit the employee to clear his name, since he did not dispute the truth of the allegedly stigmatizing reason for the discharge. Here the case is even stronger, since petitioner not only does not contend he was innocent of any violation but also admitted his guilt at the time of the incident. In *Codd* no hearing was required on whether the discharge was justified in light of the employee's conduct because the employee had no property interest in continued employment. So, too, here no hearing was required on whether removal from the general prison population pending convening of the review board was justified, since this decision is within the discretion of prison officials and, in view of petitioner's admissions, no abuse of discretion can be shown. (FN4)

[449 U.S. 22] Even if petitioner had not represented a threat to prison security himself, his removal from the general prison population for a brief period (FN5) was fully justified in order to protect the integrity of the later hearing before the review board. Permitting inmates to return to the general prison population following a serious breach of prison discipline or violation of prison rules poses difficulties in terms of alibi construction and witness intimidation. The problems were certainly present in this case, where one of three inmates involved in a single incident admitted the charges but the other two denied them. The argument that such investigative justifications cannot outweigh the burden imposed on an innocent or possibly innocent inmate, whatever its merit in other cases, is of course not applicable in this case where petitioner has admitted and continues to admit his guilt.

Nothing in the foregoing detracts from the rule of *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), concerning the liberality with which *pro se* inmate complaints are to be read, since the complaint itself contains the admission of guilt which undermines any colorable claim. I would also note that petitioner filed his original and amended complaints on forms designed to make it easier for *pro se* inmates to articulate their claims. Such forms should make the problem of *Haines v. Kerner* recur less frequently by isolating the relevant information for the district court judge. The Court notes that the District Court gave petitioner's complaint ***183.** "careful consideration," and Judge Swygert below argued that "it is quite evident[449 U.S. 23] from the detailed treatment given by the [D]istrict [C]ourt to the issues ... that the suit was not groundless or meritless." It is odd, however, to reverse a District Court for spending considerable time and effort before concluding that a complaint was meritless. The fact that the District Court carefully examined petitioner's complaint for any possible claim before dismissing it is hardly evidence that a colorable claim must exist. Quite the contrary, it is a strong indication that no claim could be found no matter how deeply the District Court probed.

The award of attorney's fees was entirely proper in this case. The District Court expressly found that petitioner's suit was meritless in response to respondent's motion, which was based on *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), and cited that case extensively. It is clear, therefore, that the District Court was using "meritless" as that term was understood in *Christiansburg, supra*, at 421, 98 S.Ct., at 700 ("the term 'meritless' is to be understood as meaning groundless or without foundation, rather than simply that the plaintiff has ultimately lost his case").

The decision whether to award attorney's fees under 42 U.S.C. § 1988 is committed to the discretion of the district courts, who are intimately familiar with the course of the litigation. Like the Court of Appeals for the Seventh Circuit, I cannot say that the District Court abused its discretion in awarding attorney's fees in this case. In light of petitioner's own admissions it was clear from the outset that he could state no cognizable claim. This is not a case, such as was suggested in *Christiansburg, supra*, at 422, 98 S.Ct., at 700, where the claim appeared meritorious at the outset and only later was refuted by facts which

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*of Control*, Corrections Magazine, Dec. 1982, at 6.)

Later in 1981, two inmates at Marion--David Owens, a member of the Aryan Brotherhood (and the government's principal witness at the trial), and defendant Hevle, a member of the Aryan Brotherhood's commission--were talking, and Owens expressed dissatisfaction with the fact that the Brotherhood had done nothing to avenge the insult to Vargas, a member of an allied gang. Hevle told Owens that the Mexican Mafia should be given time to do ***1342** something on its own. Soon afterward Perumean and defendant Reynosa (Reynosa a member, Perumean an "associate," of the Mexican Mafia) found themselves confined in another part of Marion--the "Control Unit" (also known as "H-Unit"), where the most refractory inmates are kept. Reynosa, who earlier had told Perumean that he too was upset that the Mexican Mafia had done nothing to avenge Vargas, now (August 1981) told Perumean that he had heard that Chappelle, the "disrespecter" of Vargas, was being moved to the Control Unit. He said "they" were planning to kill Chappelle and that although he did not know what "range" (group of cells) in the Control Unit Chappelle would be on, "they" had people on every range. If Chappelle went to D range, "we" would get him (presumably, the Mexican Mafia--Reynosa and Perumean were in D range). If he went to C range, Tommy Silverstein (now back in Marion, and confined in the C range of the Control Unit) would get him, since Silverstein owed Reynosa a favor.

The Control Unit at Marion has four ranges, A through D, together housing 36 inmates on average. The ranges are locked at each end and each cell has only one occupant, who is let out of his cell once a day for about an hour and ten minutes either to recreate in the range corridor or in the Control Unit's special recreation yard, or to take a shower in the shower room at the end of the range. The inmates of the Control Unit are served their meals in their cells by guards. Although inmates from different ranges are not allowed to mingle, they can occasionally talk or shout to each other. From the Control Unit's recreation yard it is possible to shout through windows at the end of the range corridors and in the Control Unit's law library to inmates recreating in the yard, because the windows give on the yard. Within a range inmates can talk to each other between cells and also while recreating--especially since they are sometimes permitted to recreate in pairs.

A few weeks after their conversation, Owens again asked Hevle what the Aryan Brotherhood intended to do about Chappelle. Hevle replied that Bartosh, another member of the Brotherhood at Marion, was going to be sent with Silverstein to Atlanta ("writted to Atlanta," in prison lingo) to testify in a case and the two would discuss the matter there. During this trip, Bartosh and Silverstein were frequently together, and when they returned, Bartosh told Owens that Silverstein had told him that Chappelle was on Silverstein's range in the Control Unit and that Silverstein would take care of him.

Nine days later, after their evening meal, Silverstein and another inmate of C range, defendant Fountain, an "associate" of the Aryan Brotherhood, were let out of their cells to recreate. They were not kept under continuous observation by guards during the hour in which they were roaming the corridor of C range. An hour and a quarter after Silverstein and Fountain were returned to their cells Chappelle was found dead on the floor of his cell. Medical evidence showed that he had been strangled about an hour after eating, by a cord held by two people as he lay on his bed with his head leaning against the bars of the cell. The next day Reynosa told Perumean, "we finally got the son of a bitch," and later Silverstein told Perumean that he and Fountain had "yoked the nigger." Fountain told another inmate, "I am glad we killed him," and Silverstein told another, "I am just sorry I had to kill him through the bars and couldn't get next to him."

The jury convicted Silverstein and Fountain of murder, and they were sentenced to life imprisonment. The jury convicted Silverstein, Hevle, and Reynosa of conspiracy to murder. Silverstein was sentenced to 20 years in prison, and Hevle and Reynosa to 40 years each, for this crime. All of the sentences were made consecutive to the other sentences that the defendants are serving.

[1] The lapse in security that allowed Chappelle to be murdered in his cell cannot be passed over in silence. Because there is no applicable federal death sentence, because ***1343** the Control Unit at Marion imposes the most rigorous confinement in the federal prison system, and because many of the inmates confined there are serving long prison terms without prospect of early parole, the deterrent effects of criminal punishment cannot be relied upon to control the crime rate in the Control Unit. It is true that since the regulations governing confinement in a control unit in federal prison do not contemplate that a prisoner will spend his whole term of imprisonment there, see 28 C.F.R. §§ 541.48, 541.49 (the average length of stay in Marion's Control Unit is 15-18

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

months), and since the commission of an act of violence in prison is a ground for extending a prisoner's stay in the unit, see 28 C.F.R. § 541.41, inmates have some disincentive to violent behavior. That disincentive is reinforced by the fact that a prisoner under federal sentence (except for drug offenses under 21 U.S.C. § 848) is eligible for parole after he has been in prison for a maximum of ten years, no matter how long his sentence is--even if he is serving multiple life sentences--and that any additional convictions will reduce his prospects for parole. See 18 U.S.C.§ 4205(a); 28 C.F.R. § 2.36(a). But since parole in the federal system is not mandatory, the effect of an additional conviction on a prisoner's prospects for parole is inherently speculative, and may be slight when the prisoner's prospects for parole are dim anyway because of the gravity of his original crime. Cf. 28 C.F.R. §§ 2.18-2.20. Moreover, Marion takes in state prisoners who may be serving time under sentences that do not allow for parole; there are more than 50 state prisoners at Marion.

All things considered, to many inmates of Marion's Control Unit the price of murder must not be high and to some it must be close to zero. This makes it essential that the prison authorities protect the inmates from each other. They try to do that, of course, and largely succeed. Violence in federal prisons is less, in aggregate terms, than popularly supposed. Seven inmates were killed in federal prisons in 1980 (the latest date for which statistics have been published) out of a total inmate population of almost 25,000, see U.S. Dept. of Justice, Bureau of Judicial Statistics, Sourcebook of Criminal Justice Statistics--1982, at 550 (tab. 6.39), 567 (tab. 6.54). Yet, considering that inmates are supposed to be both disarmed and closely supervised, prison killings *should* be extremely rare. And, while granting as we do that federal court decisions expanding prisoners' rights to challenge both disciplinary measures and the conditions of confinement have made it more difficult than it once was to maintain order in prisons, we nevertheless were distressed to be told by government counsel at the oral argument of these appeals that even though security measures were intensified after the murder of Chappelle, they were soon circumvented and another inmate was murdered in the Control Unit. Both Silverstein and Fountain have been implicated in previous reported cases of prison killings, one under the auspices of the Aryan Brotherhood. See *United States v. Mills,* 704 F.2d 1553, 1555 (11th Cir.1983); *United States v. Fountain,* 642 F.2d 1083, 1085-86 (7th Cir.1981). Another murder of a black inmate by members of the Aryan Brotherhood is recounted in *State v. Farmer,* 126 Ariz. 569, 617 P.2d 521 (1980). What happened in the present case could not have come as much of a surprise to the authorities.

The argument pressed most strongly on this appeal is that the judge improperly excluded the evidence of a key defense witness, Norman Matthews. Matthews had been an inmate in C range on the day of Chappelle's murder, and had been let out to recreate right after Silverstein and Fountain were returned to their cells. When called to the stand to testify he was asked whether he could remember November 22, 1981, and when he answered yes, how he could remember it, to which he replied, "It was the day I killed Chappelle." Though it should not have been unexpected--Matthews had given a statement to the FBI confessing to the murder--his confession in open court caused a commotion. Defense counsel said, "All right, now, Mr. Matthews, you understand this is a court of ***1344** law and that you are called here as a witness but you have rights under the Fifth Amendment of the Constitution of the United States not to incriminate yourself. Do you understand that?" Matthews replied, "Yes." At this point the prosecutor objected to the questioning of Matthews. The judge sent the jury out and himself questioned Matthews to make sure he understood and intended to waive his Fifth Amendment right. When the judge finished explaining Matthews' Fifth Amendment right to him, the prosecutor said, "Your Honor, I think Mr. Matthews should also be advised of any potential charges of perjury if in fact he perjures himself on the witness stand." The judge then said to Matthews, "Well, do you understand that, Mr. Matthews? You are under oath and that there would be a possibility that if you would make a misstatement that you could be indicted and tried for perjury?" Matthews replied, "maybe I should take the Fifth.... [Y]ou convinced me I should protect my rights, sir." The judge then ruled that Matthews had a right to remain silent, recalled the jury, and instructed it to disregard the questions that had been put to Matthews and the answers he had given.

[2] If before Matthews had answered defense counsel's opening questions the judge, sensing that Matthews might unwittingly incriminate himself, had reminded him of his Fifth Amendment right, there could be no objection, in these appeals anyway, to the judge's action. For that was the holding of *United States v. Colyer,* 571 F.2d 941, 946 (5th Cir.1978), and the defendants do not challenge it. See also *United States v. Morrison,* 535 F.2d 223, 228 (3d Cir.1976). Their argument, rather, is that by blurting

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

or if they act with *reckless disregard of that right.* Reckless disregard of a prisoner's right to be free from sexual attacks by other inmates may be shown by the existence of pervasive risks of harm to inmates from other prisoners and the failure of prison officials to reasonable--reasonably respond to that risk.

Trial Transcript Vol. V at 51.

Neither version of the instruction defines a standard of care from which an Eighth Amendment violation may emerge.

"To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is *obduracy and wantonness* not inadvertence or error in good faith, that characterize the conduct prohibited by the cruel and unusual punishments clause."

*Wilson v. Seiter,* 501 U.S. 294, ----, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (some emphasis omitted) (quoting *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). (FN2) The instructions given allowed the jury to find liability from acts or omissions not encompassed within the *Wilson v. Seiter* test. So, the dissent would solve a purported damages error on the part of the jury while allowing error on the part of the trial judge to stand untouched. And, although the dissent may argue that it has no duty to rectify an error not brought to the attention of the trial court, it readily seeks to reverse a finding of only $1.00 nominal damages when the jury was told, certainly without objection from the plaintiffs and probably at the request of the plaintiffs, that

[i]f you find that plaintiff is entitled to a verdict, but do not find that plaintiff has sustained actual damages, then you must return a verdict for that plaintiff in amount of $1.00 as nominal damages.

Trial Transcript Vol. V at 49. I refuse to join in such an unbalanced approach. Accordingly, I concur in the result reached by Judge Magill.

BRIGHT, Senior Circuit Judge, with whom RICHARD S. ARNOLD, Chief Judge, LAY, Senior Circuit Judge, McMILLIAN, WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, join, concurring in part and dissenting in part.

We concur in the rejection of the cross-appeal by Denis Dowd, Superintendent of the Farmington Correctional Center (FCC). However, we would reverse on the appeal by Frank A. Ledferd, David Corder, Hershel Marsh and Jay M. French [hereinafter plaintiffs-appellants] and grant them a new trial on damages. Inasmuch as the Court affirms the nominal damages award, we approve of the award of attorneys' fees made by the trial court.

The plaintiffs-appellants in this case are prisoners who bring this § 1983 action, seeking money damages and equitable relief against former Superintendent Dowd and four members of his staff for their failure to protect them from the savage and heinous acts of homosexual rape in ***680** prison. The jury, although finding in favor of plaintiffs-appellants on liability, awarded each only $1.00.

By a slim seven to six vote, this court affirms the trial court's refusal to grant a new trial on damages. (FN1) The Court, in our view, engages in speculation, not supported by the record, the instructions or the parties' contentions in their arguments to the jury, in approving a verdict denying plaintiffs-appellants actual damages for the rapes.

We dissenters, following well-reasoned policy developed by courts in this circuit relating to control of prison brutality, believe a shocking injustice has been done in this case; that no justification exists for the jury's award denying the plaintiffs-appellants actual damages. Consequently, we would remand for a new trial on damages alone and instruct the trial court to consider injunctive relief.

The principal issue on appeal is whether the trial court erred in denying the plaintiffs-appellants' motion for a new trial. In our opinion, it did. We differ here with the principal opinion (FN2) because we feel damages resulting from a rape--any rape--can never be valued at only $1.00, particularly in this case, where defendant Dowd at trial never denied the rapes occurred, but asserted they were not the warden's responsibility.

I.

This circuit is not unfamiliar with prison rape and the attending responsibilities prison administrators have to curb such conduct. In 1969, then Chief District Judge J. Smith Henley ruled that cruel and unusual conditions existed at the Cummins Farm Arkansas Penitentiary. Commenting on the problem of sexual assaults at the prison, he wrote:

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Brown's offers of proof in his sworn affidavits. (FN1)

On May 31, 1987, Arlington Brown was an inmate of the Hamilton County Jail in Jasper, Florida. That morning he went to speak to Sergeant Chris Hughes about a "racial problem" in his cell. As he spoke to Hughes the officer appeared to ignore him. Brown was then told that he would have to see the Captain if he wanted a cell change. (FN2) Hughes sat down at the booking desk and began working on the computer there, and Brown returned to his cell.

Shortly after 10:30 a.m. Brown was attacked from behind by another inmate, and a fight ensued. During the scuffle Brown suffered two broken bones in his left foot and a cut under his right eye. When Sergeant Hughes arrived he told Brown to pack up his belongings so that he could be moved to an isolation cell. The inmate with whom Brown had fought was not placed in isolation until later that evening, after Hughes had gone off duty.

As Brown was walking to the isolation cell, his foot began to hurt and swell. Once in the cell, Brown hopped up to the bars and told Sergeant Hughes that his foot felt as though it was broken; Hughes promised to send someone to look at it. (FN3) When nobody came, Brown asked a trusty to get Hughes. It was not until after 3:00 p.m., however, when Sergeant Hughes' shift had ended, that Brown was able to get the attention of another correctional officer and repeat his request for medical care.

Despite a written jail policy that there should be a licensed nurse on duty at all times, there was no nurse at the jail that day. Instead, Brown was taken to Hamilton County Memorial Hospital. By the time a doctor saw Brown (sometime after 4:30 p.m.), roughly six hours had elapsed since the fight, and Brown's foot had become so swollen that the medical staff could not put a cast on it. Brown had to wait eleven days before the inflammation abated to the point that he could be fitted with a cast.

Finally, Brown claims that on August 14 Sergeant Hughes came into his cell, yelled at him, and threw out some of his property that had been lying on the floor. According to Brown, Hughes did not say anything to the other inmates in the cell who also had some of their belongings on the floor. Brown was the only black inmate in the cell.

***1537** Eleven days later, Brown initiated this action by filing a civil rights complaint form. Sixteen months of motions and discovery followed, after which the parties moved for summary judgment. The district court granted summary judgment for the defendants on three grounds. First, the district court held that Brown's statement to Sergeant Hughes that there was a problem in his cell was insufficient as a matter of law to require immediate protective action on the part of Hughes, because there was no reason to believe that Brown was in imminent danger. Second, the court found that any delay in providing medical assistance to Brown did not rise to the level of a constitutional tort, since Brown was transported to the hospital within hours of sustaining his injury. Finally, the court concluded from the record that the defendants were not deliberately indifferent to Brown's medical needs, since they provided treatment on the day of the injury and thereafter. The district court did not address Brown's claim that his property had been destroyed.

II. Protection

[4][5][6] We agree with the district court that the defendants cannot be held liable under § 1983 for failing to protect Brown. When officials become aware of a threat to an inmate's health and safety, the eighth amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection. *Hopkins v. Britton,* 742 F.2d 1308, 1310 (11th Cir.1984); *Gullatte v. Potts,* 654 F.2d 1007, 1012 (5th Cir. Unit B Aug. 1981). Merely negligent failure to protect an inmate from attack does not justify liability under section 1983, however. *Davidson v. Cannon,* 474 U.S. 344, 347-48, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). Prison officials must have been deliberately indifferent to a known danger before we can say that their failure to intervene offended "evolving standards of decency," thereby rising to the level of a constitutional tort. *Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 291-92, 50 L.Ed.2d 251 (1976); *Hopkins,* 742 F.2d at 1310. The known risk of injury must be " 'a strong likelihood, rather than a mere possibility' " before a guard's failure to act can constitute deliberate indifference. *Edwards v. Gilbert,* 867 F.2d 1271, 1276 (11th Cir.1989) (quoting *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (7th Cir.1983)); *see Meriwether v. Faulkner,* 821 F.2d 408, 417 (7th Cir.1987); *Molton v. City of Cleveland,* 839 F.2d 240, 243 (6th Cir.1988).

[7] Here, Brown has failed to offer sufficient evidence that any defendant was aware or should have been aware of a strong likelihood that Brown would be assaulted. The only warning of trouble was

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

institutions would receive guidance from the "amorphous constitutional law tenets" articulated in the majority opinion. *Id.*, at 184. See *id.*, at 183-185.

Judge Garth also joined Chief Judge Seitz' opinion, and wrote separately to criticize the majority for addressing issues not raised by the facts of this case. *Id.*, at 186.

(FN16.) In pertinent part, that Amendment provides that a State cannot deprive "any person of life, liberty, or property, without due process of law...." U.S.Const., Amdt. 14, § 1.

Respondent no longer relies on the Eighth Amendment as a direct source of constitutional rights. See Brief for Respondent 13, n. 12.

(FN17.) Brief for Petitioners 8, 11, 12, and n. 10; Brief for Respondent 15-16. See also Brief for State of Connecticut et al. as *Amici Curiae* 8. Petitioners argue that they have fully protected these interests.

(FN18.) Petitioners do not appear to argue to the contrary. See Brief for Petitioners 27-31.

(FN19.) Respondent also argues that because he was committed for care and treatment under state law he has a state substantive right to habilitation, which is entitled to substantive, not procedural, protection under the Due Process Clause of the Fourteenth Amendment. But this argument is made for the first time in respondent's brief to this Court. It was not advanced in the courts below, and was not argued to the Court of Appeals as a ground for reversing the trial court. Given the uncertainty of Pennsylvania law and the lack of any guidance on this issue from the lower federal courts, we decline to consider it now. See *Dothard v. Rawlinson*, 433 U.S. 321, 323, n. 1, 97 S.Ct. 2720, 2724, n. 1, 53 L.Ed.2d 786 (1977); *Duignan v. United States*, 274 U.S. 195, 200, 47 S.Ct. 566, 568, 71 L.Ed. 996 (1927); *Old Jordan Milling Co. v. Société Anonyme des Mines*, 164 U.S. 261, 264-265, 17 S.Ct. 113, 114-115, 41 L.Ed. 427 (1896).

***2466_** (FN20.) Professionals in the habilitation of the mentally retarded disagree strongly on the question whether effective training of all severely or profoundly retarded individuals is even possible. See, *e.g.*, Favell, Risley, Wolfe, Riddle, & Rasmussen, The Limits of Habilitation: How Can We Identify Them and How Can We Change Them?, 1 Analysis and Intervention in Developmental Disabilities 37 (1981); Bailey, Wanted: A Rational Search for the Limiting Conditions of Habilitation in the Retarded, 1 Analysis and Intervention in Developmental Disabilities 45 (1981); Kauffman & Krouse, The Cult of Educability: Searching for the Substance of Things Hoped For; The Evidence of Things Not Seen, 1 Analysis and Intervention in Developmental Disabilities 53 (1981).

(FN21.) See, *e.g.*, description of complaint *supra*, at 2455.

(FN22.) See also Brief for Appellant in No. 78-1982, pp. 11-14, 20-21, and 24 (CA3).

(FN23.) In the trial court, respondent asserted that "state officials at a state mental hospital have a duty to provide residents ... with such treatment as will afford them a reasonable opportunity to acquire and maintain those life skills necessary to cope as effectively as their capacities permit." App. to Pet. for Cert. 94a-95a. But this claim to a sweeping *per se* right was dropped thereafter. In his brief to this Court, respondent does not repeat it and, at oral argument, respondent's counsel explicitly disavowed any claim that respondent is constitutionally entitled to such treatment as would enable him "to achieve his maximum potential." Tr. of Oral Arg. 46-48.

(FN24.) Chief Judge Seitz used the term "treatment" as synonymous with training or habilitation. See 644 F.2d, at 181.

(FN25.) It is not feasible, as is evident from the variety of language and formulations in the opinions below and the various briefs here, to define or identify the type of training that may be required in every case. A court properly may start with the generalization that there is a right to minimally adequate training. The basic requirement of adequacy, in terms more familiar to courts, may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case. A federal court, of course, must identify a constitutional predicate for the imposition of any affirmative duty on a State.

Because the facts in cases of confinement of mentally retarded patients vary widely, it is essential to focus on the facts and circumstances of the case before a court. Judge Aldisert, in his

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

concurring opinion in the court below, was critical of the "majority's abandonment of incremental decision-making in favor of promulgation of broad standards ... [that] lac [k] utility for the groups most affected by this decision." *Id.*, at 183-184. Judge Garth agreed that reaching issues not presented by the case requires a court to articulate principles and rules of law in "the absence of an appropriate record ... and without the benefit of analysis, argument, or briefing" on such issues. *Id.*, at 186.

(FN26.) In Romeo's case, there can be no question that physical restraint was necessary at times. See n. 2, *supra*.

(FN27.) See also *Jackson v. Indiana*, 406 U.S. 715, 738, 192 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972) (holding that an incompetent pretrial detainee cannot, after a competency hearing, be held indefinitely without either criminal process or civil commitment; due process requires, at a minimum, some rational relation between the nature and duration of commitment and its purpose). This case differs in critical respects from *Jackson*, a procedural due process case involving the validity of an involuntary commitment. Here, respondent was committed by a court on petition of his mother who averred that in view of his condition she could neither care for him nor control his violence. N. 2, *supra*. Thus, the purpose of respondent's commitment was to provide reasonable care and safety, conditions not available to him outside of an institution.

(FN28.) See also *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). In that case, we held that the State must prove the need for commitment by "clear and convincing" evidence. See *id.*, at 431-432, 99 S.Ct., at 1812-1813. We reached this decision by weighing the individual's liberty interest against the State's legitimate interests in confinement.

***2466_** (FN29.) See *Parham v. J. R.*, 442 U.S. 584, 608, n. 16, 99 S.Ct. 2493, 2507, n. 16, 61 L.Ed.2d 101 (In limiting judicial review of medical decisions made by professionals, "it is incumbent on courts to design procedures that protect the rights of the individual without unduly burdening the legitimate efforts of the states to deal with difficult social problems"). See also *Rhodes v. Chapman*, 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981) ("[C]ourts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system ..."); *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979) (In the context of conditions of confinement of pretrial detainees, "[c]ourts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility"); *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974-2975, 41 L.Ed.2d 935 (1974) (In considering a procedural due process claim in the context of prison, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application"). See also Townsend & Mattson, The Interaction of Law and Special Education: Observing the Emperor's New Clothes, 1 Analysis and Intervention in Developmental Disabilities 75 (1981) (judicial resolution of rights of the handicapped can have adverse as well as positive effects on social change).

(FN30.) By "professional" decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care--including decisions that must be made without delay--necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

(FN31.) All members of the Court of Appeals agreed that respondent's expert testimony should have been admitted. This issue was not included in the questions presented for certiorari, and we have no reason to disagree with the view that the evidence was admissible. It may be relevant to whether petitioners' decisions were a substantial departure from the requisite professional judgment. See *supra*, at this page.

(FN1.) See also Garvey, Freedom and Choice in Constitutional Law, 94 Harv.L.Rev. 1756, 1787-1791 (1981); *Welsch v. Likins*, 550 F.2d 1122, 1126, and n. 6 (CA8 1977); *Wyatt v. Aderholt*, 503 F.2d 1305 (CA5 1974), aff'g *Wyatt*

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*v. Stickney*, 325 F.Supp. 781, 785 (MD Ala.1971).

(FN2.) In the principal concurring opinion, Chief Judge Seitz, for himself and three other judges, stated:

"The state does not contest that it has placed the [respondent] in Pennhurst to provide basic care and treatment. Indeed, he has a right to treatment under state law, ... and the fact that Pennhurst has programs and staff to treat patients is indicative of such a purpose. I believe that when the purpose of confining a mentally retarded person is to provide care and treatment, as is undoubtedly the case here, it violates the due process clause to fail to fulfill that purpose." 644 F.2d, at 176.

(FN3.) At trial, respondent's attorney requested a jury instruction that

"[u]nder the Eighth and Fourteenth Amendments, state officials at a state mental hospital have a duty to provide residents of such institutions with such treatment as will afford them a reasonable opportunity to acquire *and maintain* those life skills necessary to cope as effectively as their capacities permit." App. to Pet. for Cert. 94a-95a (emphasis added).

In this Court, respondent again argued that

"without minimal habilitative efforts--basic training in fundamental life skills--institutionalized retarded persons not only will fail to develop such skills independently *but also will lose the skills they may have brought with them into the institution....* Indeed, putting aside increased risks of physical harm, if a retarded individual loses all of his previously acquired skills through prolonged institutional neglect, then the State has worked positive injury .... Once [retarded persons] have been confined they have no one but the State to turn to for help in gaining additional skills or, *at least, preserving whatever skills and abilities they have.*" Brief for Respondent 22-23 (emphasis added).

Respondent's description of the expert testimony to be offered on remand, however, suggests that he seeks training in self-care skills primarily to ensure his personal safety and the safety of others. See, *e.g.*, App. to Pet. for Cert. 100a (respondent's offer of proof that "when mentally retarded individuals learn alternative behavior, such as toilet training and dressing and so forth, [their] aggression decreases"); Brief for Respondent 22 (training in self-care skills is necessary to prevent development of "a variety of inappropriate, aggressive and self-destructive behaviors").

***2466** (FN*) Indeed, in the trial court respondent asserted a broad claim to such "treatment as [would] afford [him] a reasonable opportunity to acquire and maintain those life skills necessary to cope as effectively as [his] capacities permit." App. to Pet. for Cert. 94a.

Respondent also maintains that, because state law purportedly creates a right to "care and treatment," he has a *federal substantive* right under the Due Process Clause to enforcement of this state right. See *ante*, at 2458, n. 19. This contention is obviously frivolous; were every substantive right created by state law enforceable under the Due Process Clause, the distinction between state and federal law would quickly be obliterated.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

I join Parts I and II and all of Part III of the Court's opinion except footnote 11, see *ante*, at 1205, n. 11. I thus agree that where municipal policymakers are confronted with an obvious need to train city personnel to avoid the violation of constitutional rights and they are deliberately indifferent to that need, the lack of necessary training may be appropriately considered a city "policy" subjecting the city itself to liability under our decision in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As the Court observes, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality--a 'policy' as defined by our prior cases--can a city be liable for such a failure under [42 U.S.C.] § 1983." *Ante*, at 1205. I further agree that a § 1983 plaintiff pressing a "failure to train" claim must prove that the lack of training was the "cause" of constitutional injury at issue and that this entails more than simply showing "but for" causation. *Ante*, at 1205-1206. Lesser requirements of fault and causation in this context would "open municipalities to unprecedented liability under § 1983," *ante*, at 1206, and would pose serious federalism concerns. *Ante*, at 1206.

My single point of disagreement with the majority is thus a small one. Because I believe, as the majority strongly hints, [489 U.S. 394] see *ibid.*, that respondent has not and could not satisfy the fault and causation requirements we adopt today, I think it unnecessary to remand this case to the Court of Appeals for further proceedings. This case comes to us after a full trial during which respondent vigorously pursued numerous theories of municipal liability including an allegation that the city had a "custom" of not providing medical care to detainees suffering from emotional illnesses. Respondent thus had every opportunity and incentive to adduce the type of proof necessary to satisfy the deliberate indifference standard we adopt today. Rather than remand in this context, I would apply the deliberate indifference standard to the facts of this case. After undertaking that analysis below, I conclude that there is no evidence in the record indicating that the city of Canton has been deliberately indifferent to the constitutional rights of pretrial detainees.

I

In *Monell*, the Court held that municipal liability can be imposed under § 1983 only where the municipality, as an entity, can be said to be "responsible" for a constitutional violation committed by one of its employees. "[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for ***1208** a deprivation of rights protected by the Constitution." 436 U.S., at 690, 98 S.Ct., at 2036. The Court found that the language of § 1983, and rejection of the "Sherman Amendment" by the 42d Congress, were both strong indicators that the framers of the Civil Rights Act of 1871 did not intend that municipal governments be held vicariously liable for the constitutional torts of their employees. Thus a § 1983 plaintiff seeking to attach liability to the city for the acts of one of its employees may not rest on the employment relationship alone; both fault and causation *as to the acts or omissions of the city itself* must be proved. The Court reaffirms these requirements today.

Where, as here, a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be [489 U.S. 395] shown by proof of a background of events and circumstances which establish that the "policy of inaction" is the functional equivalent of a decision by the city itself to violate the Constitution. Without some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf *Monell*, imposing liability without regard to fault. Moreover, absent a requirement that the lack of training at issue bear a very close causal connection to the violation of constitutional rights, the failure to train theory of municipal liability could impose "prophylactic" duties on municipal governments only remotely connected to underlying constitutional requirements themselves.

Such results would be directly contrary to the intent of the drafters of § 1983. The central vice of the Sherman Amendment, as noted by the Court's opinion in *Monell*, was that it "impose[d] a species of vicarious liability on municipalities since it could be construed to impose liability even if the municipality *did not know* of an impending or ensuing riot or did not have the wherewithal to do anything about it." 436 U.S., at 692, n. 57, 98 S.Ct., at 2036, n. 57 (emphasis added). Moreover, as noted in *Monell*, the authors of§ 1 of the Ku Klux Act did not intend to create any new rights or duties beyond those contained in the Constitution. *Id.*, at 684-685, 98 S.Ct., at 2032. Thus, § 1 was referred to as "reenacting the Constitution." Cong. Globe, 42d Cong., 1st Sess., 569 (1871) (Rep. Edmunds). Representative Bingham, the author of § 1 of the Fourteenth Amendment, saw the purpose of § 1983 as "the enforcement ... of the Constitution on behalf of every individual citizen of the Republic ... to the extent of the rights guaranteed to him by the Constitution." *Id.*,

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

the Court decides "not to reject [wisdom] merely because it comes late," *Henslee v. Union Planters Bank*, 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting).

As the Court demonstrates, the Sherman amendment presented an extreme example of "riot act" legislation that sought to impose vicarious liability on government subdivisions for the consequences of private lawlessness. As such, it implicated concerns that are of marginal pertinence to the operative principle of § 1 of the 1871 legislation--now § 1983--that "any person" acting "under color of" state law may be held liable for affirmative conduct that "subjects, or causes to be subjected, any person . . . to the deprivation of any" federal constitutional or statutory right. Of the many reasons for the defeat of the Sherman proposal, none supports *Monroe* 's observation that the 42d Congress was fundamentally "antagonistic," 365 U.S., at 191, 81 S.Ct. 473, to the proposition that government entities and natural persons alike should be held accountable for the consequences of conduct directly working a constitutional violation. Opponents in the Senate appear to have been troubled primarily by the proposal's unprecedented lien provision, which would have exposed even property held for public purposes to the demands of § 1983 judgment lienors. *Ante*, at 2027, 2028, n. 30. The opposition in the House of Representatives focused largely ***2044** on the Sherman amendment's attempt to impose a peacekeeping obligation on municipalities when the Constitution itself imposed no such affirmative duty and when many municipalities were not even empowered under state law to maintain police forces. *Ante*, at 2027-2028, 2030-2032. (FN2)

[436 U.S. 707] The Court correctly rejects a view of the legislative history that would produce the anomalous result of immunizing local government units from monetary liability for action directly causing a constitutional deprivation, even though such actions may be fully consistent with, and thus not remediable under, state law. No conduct of government comes more clearly within the "under color of" state law language of § 1983. It is most unlikely that Congress intended public officials acting under the command or the specific authorization of the government employer to be *exclusively* liable for resulting constitutional injury. (FN3)

As elaborated in Part II of today's opinion, the rejection of the Sherman amendment can best be understood not as evidence of Congress' acceptance of a rule of absolute municipal immunity but as a limitation of the statutory ambit to actual wrongdoers, *i. e.*, a rejection of *respondeat superior* or any other principle of vicarious liability. Cf. Levin, The Section 1983 Municipal Immunity Doctrine, 65 Geo.L.J. 1483, 1531-1535 (1977). Thus, it has been clear that a public official may be held liable in damages when his actions are found to violate a constitutional right and there is no qualified immunity, see *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 922, 43 L.Ed.2d 214 (1975); *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Today the Court recognizes [436 U.S. 708] that this principle also applies to a local government when implementation of its official policies or established customs inflicts the constitutional injury.

II

This Court traditionally has been hesitant to overrule prior constructions of statutes or interpretations of common-law rules. "*Stare decisis* is usually the wise policy," *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting), but this cautionary principle must give way to countervailing considerations in appropriate circumstances. (FN4) I concur in the Court's view that this is not a case where we should "place on the shoulders of Congress the burden of the Court's own error." *Girouard* ****2045** v. United States*, 328 U.S. 61, 70, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946).

Nor is this the usual case in which the Court is asked to overrule a precedent. Here considerations of *stare decisis* cut in both directions. On the one hand, we have a series of rulings that municipalities and counties are not "persons" for purposes of § 1983. On the other hand, many decisions of this Court have been premised on the amenability of school boards and similar entities to § 1983 suits.

In *Monroe* and its progeny, we have answered a question that was never actually briefed or argued in this Court--whether a municipality is liable in damages for injuries that are the direct result of its official policies. "The theory of the complaint [in *Monroe* was] that under the circumstances [t]here alleged the City [was] liable for the acts of its police officers, by virtue of*respondeat superior*. " Brief for Petitioners,[436 U.S. 709] O.T.1960, No. 39, p. 21. (FN5) Respondents answered that adoption of petitioners' position would expose "Chicago and every other municipality in the United States . . . to

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

(FN28.) See, *e. g., Gelpcke v. City of Dubuque*, 68 U.S. 175, 1 Wall. 175, 17 L.Ed. 519 (1864); *Von Hoffman v. City of Quincy*, 71 U.S. 535, 4 W all. 535, 18 L.Ed. 403 (1867); *Riggs v. Johnson County*, 73 U.S. 166, 6 Wall. 166, 18 L.Ed. 768 (1868); *Weber v. Lee County*, 73 U.S. 210, 6 W all. 210, 18 L.Ed. 781 (1868); *Supervisors v. Rogers*, 74 U.S. 175, 7 W all. 175, 19 L.Ed. 162 (1869); *Benbow v. Iowa City*, 74 U.S. 313, 7 W all. 313, 19 L.Ed. 79 (1869); *Supervisors v. Durant*, 76 U.S. 415, 9 W all. 415, 19 L.Ed. 732 (1870). See generally 6 C. Fairman, History of the Supreme Court of the United States: Reconstruction and Reunion, 1864-1888, chs. 17-18 (1971).

***2053**_ (FN29.) See Globe 751-752.

(FN30.) Others taking a view similar to Representative Blair's included: Representative Willard, see *id.*, at 791; Representative Poland, see *id.*, at 794; Representative Burchard, see *id.*, at 795; Representative Farnsworth, see *id.*, at 799. Representative Willard also took a somewhat different position. He thought that the Constitution would not allow the Federal Government to dictate the manner in which a State fulfilled its obligation of protection. That is, he thought it a matter of state discretion whether it delegated the peacekeeping power to a municipal or county corporation, to a sheriff, etc. He did not doubt, however, that the Federal Government could impose on the *States* the obligation imposed by the Sherman amendment, and presumably he would have enforced the amendment against a municipal corporation to which the peacekeeping obligation had been delegated. See *id.*, at 791.

Opponents of the Sherman amendment in the Senate agreed with Blair that Congress had no power to pass the Sherman amendment because it fell outside limits on national power implicit in the federal structure of the Constitution and recognized in, *e. g., Collector v. Day*, 11 Wall. 113, 20 L.Ed. 122 (1871). However, the Senate opponents focused not on the amendment's attempt to obligate municipalities to keep the peace, but on the lien created by the amendment, which ran against *all* money and property of a defendant municipality, including property held for public purposes, such as jails or courthouses. Opponents argued that such a lien once entered would have the effect of making it impossible for the municipality to function, since no one would trade with it. See, *e. g.*, Globe 762 (Sen. Stevenson); *id.*, at 763 (Sen. Casserly). Moreover, everyone knew that sound policy prevented execution against public property since this, too, was needed if local government was to survive. See, *e. g., ibid.* See also *Meriwether v. Garrett*, 102 U.S. 472, 501, 513, 26 L.Ed. 197 (1880) (recognizing principle that public property of a municipality was not subject to execution); 2 J. Dillon, The Law of Municipal Corporations§§ 445-446 (1873 ed.) (same).

Although the arguments of the Senate opponents appear to be a correct analysis of then-controlling constitutional and common-law principles, their arguments are not relevant to an analysis of the constitutionality of§ 1 of the Civil Rights Act since any judgment under that section, as in any civil suit in the federal courts in 1871, would have been enforced pursuant to *state* laws under the Process Acts of 1792 and 1828. See Act of May 8, 1792, ch. 36, 1 Stat. 275; Act of May 19, 1828, 4 Stat. 278.

(FN31.) See n. 30, *supra*.

(FN32.) In addition to the cases discussed in the text, see *Lane County v. Oregon*, 7 Wall. 71, 77, 81, 19 L.Ed. 101 (1869), in which the Court held that the federal Legal Tender Acts should not be construed to require the States to accept taxes tendered in United States notes since this might interfere with a legitimate state activity.

(FN33.) Mr. Chief Justice Taney agreed:

"The state officers mentioned in the law [of 1793] are not bound to execute the duties imposed upon them by Congress, unless they choose to do so, or are required to do so by a law of the state; and the state legislature has the power, if it thinks proper, to prohibit them. The act of 1793, therefore, must depend altogether for its execution upon the officers of the United States named in it." 16 Pet., at 630 (concurring in part).

(FN34.) See *supra*, at 2025-2026, and n. 21.

(FN35.) "*Be it enacted* . . . That whenever the executive authority of any state in the Union . . . shall demand any person as a fugitive from justice . . . and shall moreover produce the copy of an indictment found . . . charging the person so demanded, with having committed treason, felony or other crime, certified as authentic by the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

quality of the work, the zealous manner in which plaintiffs' attorneys pursued their cause, and the effect this litigation had on the attorneys' small firm. *Id.* at 3. In addition, the court awarded attorneys' fees to counsel based on a flat hourly fee of $100 even though plaintiffs' lead counsel presented substantial evidence supporting a fee of $175 an hour for his time. After reviewing the district court's calculations and the evidence submitted by plaintiffs, we cannot find that the district court abused its discretion in this case.

*677 E. Instruction

Dowd argues that the instruction on the standard to determine whether he violated the Eighth Amendment was erroneous. The instruction read as follows:

> Prison officials may be liable for violation of a prisoner's civil rights, where they are deliberately indifferent to a prisoner's constitutional right to be free from sexual attacks by other inmates, if they actually intend to deprive them of that right, or if they act with careless disregard of this right. Reckless disregard of the prisoner's right to be free from sexual attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and failure of prison officials reasonably to respond to that risk.

We have clearly held that a prison official may be liable for a violation of a prisoner's right to be free from sexual attacks by other inmates if that official is deliberately indifferent to that right or acts with reckless disregard for the right. *Vosburg,* 845 F.2d at 765-66; *Martin,* 742 F.2d at 474. Dowd argues that *Wilson,* 501 U.S. at ---- - ----, 111 S.Ct. at 2326-27, has changed the law and he should not have been subject to liability for reckless disregard. Dowd contends that he is therefore entitled to a new trial on liability. Dowd argues this issue for the first time on appeal. He did not object to the instruction at the time of trial. We do not address this issue because it has not been preserved and, therefore, is not before us. *See Diamonds Plus, Inc. v. Kolber,* 960 F.2d 765, 768 (8th Cir.1992); *United States v. Standefer,* 948 F.2d 426, 430 (8th Cir.1991).

III.

For the foregoing reasons, we affirm the district court on all counts.

BEAM, Circuit Judge, concurring specially.

I agree with much that is said in Judge Bright's dissent and would agree to reverse and remand this matter for a new trial on all issues--liability, causation, and damages. I will not agree, however, under the circumstances of this case, to treat one party unfairly in an attempt to treat the other fairly, especially when justice can be done for both. Accordingly, with reluctance, I concur in the result reached in the opinion prepared by Judge Magill.

First, I disagree with both opinions that the jury verdict stands for the proposition that each plaintiff was raped at least once. This conclusion is speculative and unsupported by the actions taken by the jury.

The plaintiffs contend that a jury verdict in favor of each plaintiff proves at least one rape because of the following instructions:

> If you find that any one or more of the Plaintiffs consented or was not forcibly compelled to engage in any alleged *sexual conduct* with other inmates, then your verdict must be for the Defendant.
>
> ....
>
> Your verdict must be for any of the Plaintiffs and against the Defendant, Denis Dowd, if you find that: One, the Plaintiff was subjected to one or more*sexual attacks* by prisoners in Farmington Correctional Center. Two, Defendant knew or should have known the prisoners, such as Plaintiff, were subject to a pervasive risk of *sexual attack.* Three, Defendant failed to respond reasonably to the risk of *such attacks.* Four, the Defendant's conduct was a proximate cause of the Plaintiff's injury. And five, the Plaintiff was injured.

Appellants' Reply and Answer Brief at 7 & n. 2 (emphasis added) (citations omitted).

The record contains much evidence concerning rape, threatened rape, and physical and mental abuse of a sexual and nonsexual nature short of rape. All of this activity could properly have been understood by the jury to constitute "sexual conduct," "sexual attacks," and "sexual assault," (FN1) the various terms used by the trial court in its instructions. Further, in accordance with our opinion in *Cowans v. Wyrick,* 862 F.2d *678 697, 700 (8th Cir.1988) To

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

view preceding link please click here the jury was told "injury or damage[s] ... can include ... physical pain and discomfort, and any emotional and mental harm ... suffered, including fear, humiliation and mental anguish." Trial Transcript Vol. V at 47-48.

Thus, while I agree, as stated in *Cowans,* that harm of some kind is a relevant element in a determination that a constitutional violation has occurred, a finding of liability under the verdict director instruction given in this case does not necessarily establish that an actual rape occurred involving each plaintiff, or any plaintiff for that matter.

Second, and of perhaps more importance, the very nature of an Eighth Amendment claim makes partial remand for consideration of only damages improper, especially under the circumstances of this particular dispute. It is elemental that plaintiffs must have carried the burden of proof of the issues of liability, causation, and damages. Because, as discussed, proof of liability in an Eighth Amendment context requires a finding of some element of harm, all issues--liability, causation, and damages--are inextricably intertwined. Thus, a remand to consider damages alone is constitutionally suspect. The practice of retrial on one issue is constitutional, but only if the issue remanded is "so distinct and separable from the others [in the trial] that a [new] trial of it alone may be had without injustice." *Gasoline Prod. Co. v. Champlin Ref. Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). In this circuit, a district court in considering a trial on less than all of the issues must determine that (1) the issues are clearly distinct; (2) the bifurcation will not prejudice either party; and (3) the action will result in judicial economy. *See Taylor v. RayGo, Inc.,* 680 F.2d 1223, 1224 (8th Cir.1982). If the issues are not clearly separable, a bifurcation of issues is an abuse of discretion. *O'Dell v. Hercules, Inc.,* 904 F.2d 1194, 1202 (8th Cir.1990). Bifurcation must be very cautiously considered where the injury itself, as here, has an important bearing on liability. *Id.* (citing *Hosie v. Chicago & North Western R.R.,* 282 F.2d 639, 643-44 (7th Cir.1960)), *cert. denied,* 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961). I can see no reasoned way for this court to deviate from these principles in making a decision to remand this case for retrial on damages only.

As discussed, under the evidence adduced and instructions given, the finding of sufficient harm to impose liability and the finding of only nominal damages as a result of the breach of duty are not necessarily inconsistent. *See, e.g., Cowans,* 862 F.2d at 700 (if jury finds cruel and unusual punishment--which finding involves an element of harm--nominal damages are proper if jury is unable to place a monetary value on harm suffered). Even so, the result here points toward a compromise verdict. In other words, the verdict strongly suggests a recognition by the jury of the inter-relationship of the issues and a trade-off between liability, causation, and damages. In the face of a compromise verdict, courts have never found the issues to be sufficiently separable to approve a retrial on one issue only. *See, e.g., Smallwood v. Dick,* 114 Idaho 860, 761 P.2d 1212, 1216 (1988). *See generally,* Jack B. Weinstein, *Routine Bifurcations of Jury Negligence Trials,* 14 Vand.L.Rev. 831, 842 (cited in the 1966 amendment notes to Fed.R.Civ.P. 42(b)).

The possibility of a compromise verdict leads to my third concern, a problem neither the majority nor the dissent sufficiently discusses. The jury instruction on Eighth Amendment liability was flawed. Granted, there was not an adequate objection to the improper instruction by the defendant at trial and, I would usually require the defendant to live with any untoward result. However, the faulty instruction becomes an overriding concern when considering a remand for retrial, especially on one issue only.

The improper liability instruction was given twice, in differing versions. Both versions were inconsistent with proper Eighth Amendment jurisprudence. It was first stated as follows:

> Prison officials may be liable for violation of a prisoner's civil rights, where ***679** they are deliberately indifferent to a prisoner's constitutional right to be free from sexual attacks by other inmates, if they actually intend to deprive them of that right, or if they act with *careless disregard of this right.* Reckless disregard of the prisoner's right to be free from sexual attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and failure of prison officials reasonably to respond to that risk.

Trial Transcript Vol. V at 45. Later, the judge, stating that he had misread the instruction, said:

> Prison officials may be liable for a violation of a prisoner's civil rights where they are deliberately indifferent to a prisoner's constitutional right to be free from sexual attacks by other inmates; or if they actually intend to deprive him of that right;

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

not challenge that assertion. At trial, Dowd's attorney stated: "Denis Dowd ... doesn't know if they were sexually assaulted." Trial Tr., Vol. V p. 24. Dowd's defense asserted a denial of any responsibility for the rapes. (FN5) Third, defendant's counsel recognized that plaintiffs-appellants' case rested on

> The Victim Profile, The Attacker Profile. You heard their testimony that we're small, the attackers are big. We're white, the attackers are black. We're young, they were not. And we're in jail for armed robbery, sodomy, child abuse, deviate sexual assault, and burglary. These people were violent. You shouldn't have put us in with these violent people, because they would attack us and you should have known that.

Trial Tr., Vol. V p. 30. Counsel added, quoting denial by Dowd. "I don't believe that profile exists." Trial Tr., Vol. V p. 30.

Contrary to the view expressed in the principal opinion that each plaintiff-appellant suffered only a single attack (although even a single attack justifies a substantial award), the jury's liability determination rested on uncontested proof of several rapes to each plaintiff-appellant. In this regard, we observe that Dowd did not segregate his defense on individual rapes, but denied responsibility for all that occurred. Moreover, the instruction referred to not one (*see ante,* at 670), but "one or more sexual attacks." Trial Tr., Vol. V p. 47.

Finally, the jury instructions belie the contention in the principal opinion that plaintiffs-appellants consented to sexual activity with fellow prisoners and, thus, are entitled only to nominal damages. The trial court instructed:

> If you find that any one or more of the plaintiffs consented or was not forcibly compelled to engage in any alleged sexual conduct with other inmates, then your verdict must be for the defendant. Consent or lack of consent may be expressed or implied. Forcible compulsion means physical force that overcomes reasonable resistance or a threat that places a person in reasonable fear of death or serious physical harm. When I use the word consent, I mean willingness, in fact, for conduct to occur. It may be manifested by action or inaction. It need not be communicated to the actor. If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact.
>
> However, consent is not effective, if it is given under duress. Duress is constraint of another's will by which a person is compelled to give consent whether or not he is, in reality, willing to do so.

Trial Tr., Vol. V pp. 46-47. In light of the evidence and this instruction, the assertion in the principal opinion must be rejected.

In these circumstances, the award in this case shocks our senses. Even the assumption in the principal opinion, that the jury verdict may reflect that each appellant suffered only a single incidence of rape related to the unconstitutional conduct of Dowd, clearly warrants more than $1.00 in damages. That the brutal acts to which the plaintiffs-appellants were subjected are somehow on the *de minimis* end of a damages scale is, in our opinion, a sad commentary on this case. In light of our discussion above, the award is so inadequate as to constitute a plain injustice to the plaintiffs-appellants. *Nelson v. All American Life and Financial Corp.,* 889 F.2d 141, 152 (8th Cir.1989). Accordingly, we would remand this case for a trial on damages.

IV.

In the principal opinion, Corder's plea for injunctive relief is denied on the grounds that Corder fails to present sufficient evidence indicating he is currently subject to a pervasive risk of attack. The district court summarily denied Corder's plea for injunctive ***684** relief. Because Corder's claim may have merit, particularly in light of other evidence uncovered in this case, we would remand to determine the scope of the threat faced by Corder, (FN6) and permit the district court, at its discretion, to reopen the record for additional evidence on this issue. Plaintiffs-appellants, including Corder who remains incarcerated, have made a number of reasonable requests for injunctive relief that deserve scrutiny. Corder specifically requested a training program for FCC employees to acquaint them with the risks of sexual assaults; the development of procedures to be followed with respect to sexual assault complaints; the development of an orientation program to instruct new prisoners on their vulnerability to sexual assault; the development of a system to segregate predatory prisoners from more vulnerable prisoners; the establishment of protective custody cells which are available upon demand without the need for a preliminary stay in the punitive environment of administrative segregation; the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

implementation of a system which would protect prisoners from being held captive by other prisoners in a cell through the night; the establishment of procedures for the investigation and referral of sexual assault complaints to the local prosecuting attorney; the establishment of punishments for predatory prisoners; and the review of job assignments for predatory prisoners to ensure they have no contact with those seeking protective custody.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting, with whom McMILLIAN, Circuit Judge, joins.

I write separately to offer some observations appropriate to this case on the subject of damages for pain and suffering. Many lawyers evidently regard such damages as a kind of *tertium quid,* neither compensatory nor exemplary, simply an inscrutable sop to a tort victim. This attitude manifests itself in a number of odd ways. For instance, in Arkansas, the jury is not asked to discount an award for future pain and suffering to present value as it is with respect to other sorts of future damages. *See* AMI Civil 3d, 2201, 2205, 2206, 2207, 2209, 2219. Lawyers will also typically describe pain and suffering damages as "non-economic," further emphasizing the belief in their peculiar character. I suggest, too, that even economists have contributed to the confusion by calling those kinds of losses "non-pecuniary."

The truth is, however, that these kinds of awards are necessarily compensatory in nature. Their aim, therefore, must be to make the sufferer as content or happy as he or she would have been but for the compensable injury. Putting the matter this way usefully highlights the difficulty that juries may often have in assessing damages for mental suffering. Without evidence of what kinds of things increase a particular plaintiff's subjective welfare, that is, his or her enjoyment of life, and without evidence of their cost, juries may feel that they are operating in the dark. It is a question whether, in a proper case, a court ought to direct a verdict on the question of damages for suffering because insufficient evidence on compensation has been presented, but no such request was made here; and, moreover, the custom seems to be to allow the question to go to the jury if there is sufficient evidence that pain and suffering actually occurred. This latter characteristic of current practice may simply be another manifestation of the inscrutable sop theory of pain and suffering damages. But there is another, perhaps more probable explanation for it. Jurors are regularly invited to use their common sense and the knowledge that they have in the ordinary affairs of life in arriving at their verdicts. Presumably, they are expected to arrive at an appropriate figure for compensating pain and suffering based on their experience with the general run of humanity. Besides, the correct measure of damages may well be the generic or market ***685.** value of the pain suffered, though this is not well developed in the cases.

Because a number fixed on in this fashion is likely to be reasonable if it falls within rather broad and elastic limits, an award for pain and suffering will only rarely be disturbed on appeal, especially since we review the award by asking whether it is "shocking" or "monstrous," itself at least a partly subjective inquiry with each judge. (One wonders if there is some transcendent objective conscience that we are supposed to be consulting.) But in this case, the act that was committed was so horrendous that no reasonable person could have found that the plaintiffs' suffering was *de minimis.* It is true that the record on the extent of damages, not to mention what kind of compensation was appropriate, was not well developed. But zero is, in my mind, a wholly unacceptable number, indeed a shocking one, and I would therefore remand for a retrial on the issue of damages. It is just possible that the jurors regarded the prisoners' life as so dismal and degraded before the rapes that the rapes did not diminish their enjoyment of it. But, in my view, no reasonable person could have come to that conclusion on this record. It is also possible that the jury meant to indicate by their verdict not that they had unanimously agreed to award the plaintiffs nothing, but, instead, that they were unable to agree on a particular number. But, even so, a new trial on damages would be required because the jury was hung. I do not read *Cowans v. Wyrick,* 862 F.2d 697 (8th Cir.1988), or *Warren v. Fanning,* 950 F.2d 1370 (8th Cir.1991), *cert. denied,* 506 U.S. 836, 113 S.Ct. 111, 121 L.Ed.2d 68 (1992), as being inconsistent with or contrary to this last observation.

I therefore respectfully dissent from the judgment of the court.

(FN1.) The Honorable Robert L. Kingsland, United States Magistrate Judge for the Eastern District of Missouri.

(FN2.) Three of the plaintiffs have since been released. Only David Corder is still incarcerated. His first parole hearing is set for December 1992.

(FN3.) Two other inmates were also plaintiffs in the original action. Their claims were voluntarily

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

governor or chief magistrate of the state . . . from whence the person so charged fled, it shall be the duty of the executive authority of the state or territory to which such person shall have fled, to cause him or her to be arrested and secured . . . and to cause the fugitive to be delivered to such agent [of the demanding State] when he shall appear . . . ." 1 Stat. 302.

(FN36.) "The Supreme Court of the United States has decided repeatedly that Congress can impose no duty on a State officer." Globe 799 (Rep. Farnsworth). See also *id.*, at 788-789 (Rep. Kerr).

***2053_** (FN37.) See, *e. g.*, *id.*, at 764 (Sen. Davis); *ibid.* (Sen. Casserly); *id.*, at 772 (Sen. Thurman) (reciting logic of *Day* ); *id.*, at 777 (Sen. Frelinghuysen); *id.*, at 788-789 (Rep. Kerr) (reciting logic of *Day* ); *id.*, at 793 (Rep. Poland); *id.*, at 799 (Rep. Farnsworth) (also reciting logic of *Day* ).

(FN38.) *Warren v. Paul*, 22 Ind. 276 (1864); *Jones v. Estate of Keep*, 19 Wis. 369 (1865); *Fifield v. Close*, 15 Mich. 505 (1867); *Union Bank v. Hill*, 43 Tenn. 325 (1866); *Smith v. Short*, 40 Ala. 385 (1867).

(FN39.) See Globe 764 (Sen. Davis); *ibid.* (Sen. Casserly). See also T. Cooley, Constitutional Limitations *483-*484 (1871 ed.).

(FN40.) See cases cited in n. 28, *supra*. Since this Court granted unquestionably "positive" relief in Contract Clause cases, it appears that the distinction between the Sherman amendment and those cases was not that the former created a positive obligation whereas the latter imposed only a negative restraint. Instead, the distinction must have been that a violation of the Constitution was the predicate for "positive" relief in the Contract Clause cases, whereas the Sherman amendment imposed damages without regard to whether a local government was in any way at fault for the breach of the peace for which it was to be held for damages. See *supra*, at 2024. While no one stated this distinction expressly during the debates, the inference is strong that Congressmen in 1871 would have drawn this distinction since it explains why Representatives Poland, Burchard, and Willard, see *supra*, at 2030-2031, could oppose the amendment while at the same time saying that the Federal Government might impose damages on a local government that had defaulted in a state-imposed duty to keep the peace, and it also explains why everyone agreed that a state or municipal officer could constitutionally be held liable under § 1 for violations of the Constitution. See *infra*, at 2031-2032.

(FN41.) See, *e. g.*, Globe 334 (Rep. Hoar); *id.*, at 365 (Rep. Arthur); *id.*, at 367-368 (Rep. Sheldon); *id.*, at 385 (Rep. Lewis); Globe App. 217 (Sen. Thurman). In addition, officers were included among those who could be sued under the second conference substitute for the Sherman amendment. See Globe 805 (exchange between Rep. Willard and Rep. Shellabarger). There were no constitutional objections to the second report.

(FN42.) See *id.*, at 795 (Rep. Blair); *id.*, at 788 (Rep. Kerr); *id.*, at 795 (Rep. Burchard); *id.*, at 799 (Rep. Farnsworth).

(FN43.) "[W]e cannot command a State officer to do any duty whatever, as such; and I ask . . . the difference between that and commanding a municipality . . . ." *Id.*, at 795.

(FN44.) See Globe App. 216-217, quoted in n.45, *infra*. In 1880, moreover, when the question of the limits of the *Prigg* principle was squarely presented in *Ex parte Virginia*, 100 U.S. 339, 25 L.Ed. 676, this Court held that *Dennison* and *Day* and the principle of federalism for which they stand did not prohibit federal enforcement of § 5 of the Fourteenth Amendment through suits directed to state officers. See 100 U.S., at 345-348.

(FN45.) Representative Bingham, the author of § 1 of the Fourteenth Amendment, for example, declared the bill's purpose to be "the enforcement . . . of the Constitution on behalf of every individual citizen of the Republic . . . to the extent of the rights guarantied to him by the Constitution." Globe App. 81. He continued:

"The States never had the right, though they had the power, to inflict wrongs upon free citizens by a denial of the full protection of the laws . . . [And] the States did deny to citizens the equal protection of the laws, they did deny the rights of citizens under the Constitution, and except to the extent of the express limitations upon the States, as I have shown, the citizen had no remedy. . . . They took property without compensation, and he had no remedy. They restricted the freedom of the press, and he had no remedy. They restricted the freedom

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Brown's statement to Sergeant Hughes that there was a "racial problem" in his cell. Brown did not say that he had been threatened, or that a fight was imminent, or that he feared an attack, nor is there evidence that racial tensions in the jail frequently resulted in violence. After Sergeant Hughes indicated that he was not going to do anything about the problem right away, Brown apparently returned to his cell voluntarily. In retrospect and with all the benefit of hindsight, we know today that a prompt response by Hughes to Brown's request for a transfer would have prevented Brown's injuries. Nevertheless, we cannot say that Sergeant Hughes' refusal to act under the circumstances constituted deliberate indifference to Brown's safety and rendered his confinement cruel or unusual.

III. Medical Assistance

The district court erred, however, when it held that any delay in giving medical treatment to Brown was not prolonged enough to violate the Constitution, and when it concluded from the record that the defendants were not deliberately indifferent to Brown's need for medical attention.

A. Constitutionally Cognizable Injury

[8][9][10] Deliberate indifference to a prisoner's serious medical needs violates the eighth amendment because denying or delaying medical treatment is tantamount to "unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. at 104, ***1538** 97 S.Ct. at 291; To view preceding link please click here *Washington v. Dugger,* 860 F.2d 1018, 1021 (11th Cir.1988). In their motion for summary judgment, defendants do not dispute that a broken foot can be a serious and painful injury. (FN4) With this type of injury, it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves. Deliberately inflicted pain, as with an electric cattle prod, does not become unimportant and unactionable under the eighth amendment simply because the pain produced is only momentary. Even if we were to recognize as de minimus delays of a few seconds or minutes, a deliberate delay on the order of hours in providing care for a serious and painful broken foot is sufficient to state a constitutional claim. *See Aldridge v. Montgomery,* 753 F.2d 970, 972-73 (11th Cir.1985) (two and a half hour delay in treatment for a bleeding cut under the eye held actionable); *Hughes v. Noble,* 295 F.2d 495 (5th Cir.1961) (thirteen hour delay for broken and dislocated cervical vertebrae).

B. Deliberate Indifference

[11] In order for Brown to avoid summary judgment against him, he must offer some evidence that prison officials were deliberately indifferent to his injuries. A prison guard's intentional denial or delay of medical care is evidence of deliberate indifference. *Estelle v. Gamble,* 429 U.S. at 104, 97 S.Ct. at 291. When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference. *Thomas v. Town of Davie,* 847 F.2d 771, 772-73 (11th Cir.1988); *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 704 (11th Cir.1985); *see H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1087 (11th Cir.1986).

[12] The trial court found that the defendants were not deliberately indifferent to Brown's broken foot because Brown received medical care the same day as the injury. This overlooks the fact that none of the defendants were involved in sending Brown to the hospital; that was done by officers who are not named in this action. Even if the defendants had eventually arranged for medical care, delay of less than a day would not by itself preclude a finding of deliberate indifference as a matter of law. To the contrary, an unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference. *See Estelle v. Gamble,* 429 U.S. at 104 & n. 11, 97 S.Ct. at 291 & n. 11 (citing *Hughes,* 295 F.2d at 495 (thirteen hours) and *Fitzke v. Shappell,* 468 F.2d 1072 (6th Cir.1972) (twelve hours)); *Aldridge,* 753 F.2d at 972-73 (two and a half hours).

[13] Here, Brown has submitted affidavits stating that Hughes was called to his cell because there had been fight, that while Hughes was present Brown began to limp and then hop on one leg, that his foot ***1539.** began to swell severely, that he told Sergeant Hughes his foot felt as though it were broken, and that Hughes promised to send someone to look at it but never did. Brown claims that he asked a trusty to get Hughes, but it was only after Hughes went off duty that he was able to summon help. Sergeant Hughes' affidavit presents an entirely different picture. According to Hughes, Brown said nothing about his foot, and there did not appear to be anything wrong with him. Obviously, then, there is a genuine issue of material fact as to whether Sergeant Hughes knew of Brown's condition during the hours in which no medical care was provided. Consequently, neither Hughes nor Brown is entitled to summary judgment.

[14] Brown has failed to offer any evidence,

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

however, that defendants Rhoden, Tompkins, Cundiff or Daniels were aware of his injury on the day it occurred. Although no nurses were present at the jail that day, the procedure of sending Brown to the hospital, once employed, was sufficient to ensure that Brown's foot was treated promptly. Thus, Brown has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.

IV. Destruction of Property

[15] Finally, Brown has submitted two affidavits stating that Hughes singled him out for unequal treatment by throwing out some of his belongings that were left on the floor, while ignoring those owned by his white cellmates. Appellants point out that this issue is not raised in Brown's amended complaint. They urge us to ignore these allegations, as the district court did.

On his original civil rights complaint form, Brown alleged that Hughes had thrown out his property. When the district court ordered Brown to submit an amended complaint form, however, Brown apparently forgot to re-allege this claim. Brown's subsequent filings, such as his pre-trial narrative statement and his motion for summary judgment, clearly demonstrate that Brown never intended to relinquish this claim against Hughes. The district court should have construed Brown's repeated assertions that his property had been destroyed as a motion to amend his complaint filed out of time, and, in the interest of justice, should have allowed amendment under Rule 15(a) of the Federal Rules of Civil Procedure. *See Sherman v. Hallbauer,* 455 F.2d 1236, 1242 (5th Cir.1972).

Brown has moved for summary judgment on this issue and Hughes has failed to respond in his affidavit. However, since Brown's original complaint was never served on Hughes, and since his complaint was never formally amended to include this cause of action, Hughes should be given another opportunity to respond to Brown's motion for summary judgment.

V. Summary

The district court's order granting defendants' motion for summary judgment is REVERSED with regard to the claims of denial of medical assistance and destruction of property against defendant Hughes but is otherwise AFFIRMED. The district court's order denying plaintiff's motion for summary judgment is VACATED with regard to the claim of destruction of property but is otherwise AFFIRMED.

AFFIRMED in part; REVERSED in part; VACATED in part; and REMANDED.

(FN*) Judge Robert S. Vance was a member of the panel to which this case was submitted for disposition without oral argument pursuant to 11th Cir.R. 34-3, but due to his death on December 16, 1989 did not participate in this decision. This case is decided by a quorum. *See* 28 U.S.C. § 46(d).

(FN1.) Brown, acting without the assistance of counsel, has submitted two affidavits concerning the summary judgment motions in this case: one in support of his own motion for summary judgment, and another in response to defendants' motion. While the affidavit in support of Brown's own motion contains 29 exhibits and is extensive, the other contains only three pages of argument and is cursory. Both affidavits were before the district court, however, when it simultaneously ruled on the two motions. Consequently, we have consolidated Brown's affidavits for the purpose of deciding this appeal.

(FN2.) Sergeant Hughes states in his affidavit that he was busy processing other inmates and securing them in cellblocks when he was approached by Brown. Hughes claims that he told Brown that he would talk to him later about the problem in Brown's cell.

(FN3.) According to Hughes' affidavit, Brown did not say that he had any medical problem, and there did not appear to be anything physically wrong with him.

(FN4.) In *Estelle,* the Supreme Court suggested a range of medical needs that would be serious enough to require medical attention as a matter of constitutional right.

In the worst cases, [failure to treat an inmate's medical needs] may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency....

429 U.S. at 103, 97 S.Ct. at 290 (citations and

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

programs or activities conducted by the Department of Defense.

3-302. This order does not apply to, affect, interfere with, or modify the operation of any otherwise lawful affirmative action plan or program.

3-303. An individual shall not be deemed subjected to o discrimination by reason of his or her exclusion from the benefits of a program established consistent with federal law or limited by Federal law to individuals of a particular race, sex, color, disability, national origin, age, religion, sexual orientation, or status as a parent different from his or her own.

***115895** 3-304. This order does not apply to ceremonial or similar education or training programs or activities of schools conducted by the Department of the Interior, Bureau of Indian Affairs, that are culturally relevant to the children represented in the school. "Culturally relevant" refers to any class, program, or activity that is fundamental to a tribe's culture, customs, traditions, heritage, or religion.

3-305. This order does not apply to (a) selections based on national origin of foreign nationals to participate in covered education or training programs, if such programs primarily concern national security or foreign policy matters; or (b) selections or other decisions regarding participation in covered education or training programs made by entities outside the executive branch. It shall be the policy of the executive branch that education or training programs or activities shall not be available to entities that select persons for participation in violation of Federal or State law.

3-306. The prohibition on discrimination on the basis of age provided in this order does not apply to age-based admissions of participants to education or training programs, if such programs have traditionally been age-specific or must be age-limited for reasons related to health or national security.

Sec. 4. Administrative enforcement.

4-401. Any person who believes himself or herself to be aggrieved by a violation of this order or its implementing regulations, rules, policies, or guidance may, personally or through a representative, file a written complaint with the agency that such person believes is in violation of this order or its implementing regulations, rules, policies, or guidance. Pursuant to procedures to be established by the Attorney General, each executive department or agency shall conduct an investigation of any complaint by one of its employees alleging a violation of this Executive Order.

4-402. (a) If the office within an executive department or agency that is designated to investigate complaints for violations of this order or its implementing rules, regulations, policies, or guidance concludes that an employee has not complied with this order or any of its implementing rules, regulations, policies, or guidance, such office shall complete a report and refer a copy of the report and any relevant findings or supporting evidence to an appropriate agency official. The appropriate agency official shall review such material and determine what, if any, disciplinary action is appropriate.

(b) In addition, the designated investigating office may provide appropriate agency officials with a recommendation for any corrective and/or remedial action. The appropriate officials shall consider such recommendation and implement corrective and/or remedial action by the agency, when appropriate. Nothing in this order authorizes monetary relief to the complainant as a form of remedial or corrective action by an executive department or agency.

***115896** 4-403. Any action to discipline an employee who violates this order or its implementing rules, regulations, policies, or guidance, including removal from employment, where appropriate, shall be taken in compliance with otherwise applicable procedures, including the Civil Service Reform Act of 1978, Public Law No. 95-454, 92 Stat. 1111 [see Tables for

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

classification].

Sec. 5. Implementation and Agency Responsibilities.

5-501. The Attorney General shall publish in the Federal Register such rules, regulations, policies, or guidance, as the Attorney General deems appropriate, to be followed by all executive departments and agencies. The Attorney General shall address:

a. which programs and activities fall within the scope of education and training programs and activities covered by this order, under subsection 2-202, or excluded from coverage, under section 3 of this order;

b. examples of discriminatory conduct;

c. applicable legal principles;

d. enforcement procedures with respect to complaints against employees;

e. remedies;

f. requirements for agency annual and tri-annual reports as set forth in section 6 of this order; and

g. such other matters as deemed appropriate.

5-502. Within 90 days of the publication of final rules, regulations, policies, or guidance by the Attorney General, each executive department and agency shall establish a procedure to receive and address complaints regarding its Federally conducted education and training programs and activities. Each executive department and agency shall take all necessary steps to effectuate any subsequent rules, regulations, policies, or guidance issued by the Attorney General within 90 days of issuance.

5-503. The head of each executive department and agency shall be responsible for ensuring compliance within this order.

5-504. Each executive department and agency shall cooperate with the Attorney General and provide such information and assistance as the Attorney General may require in the performance of the Attorney General's functions under this order.

5-505. Upon request and to the extent practicable, the Attorney General shall provide technical advice and assistance to executive departments and agencies to assist in full compliance with this order.

Sec. 6. Reporting Requirements.

6-601. Consistent with the regulations, rules, policies, or guidance issued by the Attorney General, each executive department and agency shall submit to the Attorney General a report that summarizes the number and nature of complaints filed with the agency and the disposition of such complaints. For the first 3 years after the date of this order, such reports shall be submitted annually within 90 days of the end of the preceding year's activities. Subsequent reports shall be submitted every 3 years and within 90 days of the end of each 3-year period.

***115897** Sec. 7. General Provisions.

7-701. Nothing in this order shall limit the authority of the Attorney General to provide for the coordinated enforcement of nondiscrimination requirements in Federal assistance programs under Executive Order 12250 [42 U.S.C.A. § 2000d-1 note].

Sec. 8. Judicial Review.

8-801. This order is not intended, and should not be construed, to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or its employees. This order is not intended, however, to preclude judicial review of final decisions in accordance with the Administrative Procedure Act, 5 U.S.C. 701, et seq.

WILLIAM J. CLINTON

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*Susan Stewart Dickerson*, Assistant Attorney General of Oklahoma, argued the cause for petitioners. With her on the briefs were *Robert H. Henry*, Attorney General, and *David W. Lee*, *M. Caroline Emerson*, and *Sandra D. Howard*, Assistant Attorneys General.

[486 U.S. 358] *Mandy Welch* by appointment of the Court, 484 U.S. 1056, argued the cause and filed briefs for respondent.*

* A brief of *amici curiae* urging reversal was filed for the State of Alabama et al. by *Don Siegelman*, Attorney General of Alabama, and *Ed Carnes*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Robert K. Corbin* of Arizona, *Duane Woodward* of Colorado, *James T. Jones* of Idaho, *William J. Guste, Jr.*, of Louisiana, *Michael C. Moore* of Mississippi, *William L. Webster* of Missouri, *Brian McKay* of Nevada, *Stephen E. Merrill* of New Hampshire, *Lacy H. Thornburg* of North Carolina, *Roger A. Tellinghuisen* of South Dakota, *W.J. Michael Cody* of Tennessee, *David L. Wilkinson* of Utah, *Mary Sue Terry* of Virginia, and *Joseph B. Meyer* of Wyoming.

*Kenneth Stuart Gallant* filed a brief for Roger Dale Hayes as *amicus curiae* urging affirmance.

*Richard C. Neuhoff* filed a brief for the California Appellate Project as *amicus curiae*.

Susan S. Dickerson, Oklahoma City, Okl., for petitioners.

Mandy Welch, Norman, Okl., for respondent.

Justice WHITE delivered the opinion of the Court.

On May 4, 1982, after eating their evening meal in their Muskogee County, Oklahoma, home, Hugh and Charma Riddle watched television in their living room. At some point, Mrs. Riddle left the living room and was proceeding towards the bathroom when she encountered respondent Cartwright standing in the hall holding a shotgun. She struggled for the gun and was shot twice in the legs. The man, whom she recognized as a disgruntled ex-employee, then proceeded to the living room where he shot and killed Hugh Riddle. Mrs. Riddle dragged herself down the hall to a bedroom where she tried to use a telephone. Respondent, however, entered the bedroom, slit Mrs. Riddle's throat, stabbed her twice with a hunting knife the Riddles had given him for Christmas, and then left the house. Mrs. Riddle survived and called the police. Respondent was arrested two days later and charged with first-degree murder.

Respondent was tried and found guilty as charged. The State, relying on three statutory aggravating circumstances, sought the death penalty. The jury found two of them to have been established: first, the defendant "knowingly created[486 U.S. 359] a great risk of death to more than one person"; second, the murder was "especially heinous, atrocious, or cruel." Okla.Stat., Tit. 21,§§ 701.12(2) and (4) (1981). Finding that the aggravating circumstances outweighed the mitigating evidence, the jury imposed the death penalty. The Oklahoma Court of Criminal Appeals affirmed on direct appeal, *Cartwright v. State*, 695 P.2d 548, cert. denied, 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985), and later affirmed a denial of state collateral relief. *Cartwright v. State*, 708 P.2d 592 (1985), cert. denied, 474 U.S. 1073, 106 S.Ct. 837, 88 L.Ed.2d 808 (1986). Respondent then sought federal habeas corpus on several grounds. The District Court rejected each of them, including the claim that the death sentence was invalid because it rested wholly or in part on an unconstitutional aggravating circumstance, namely, the unconstitutionally vague and overbroad aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." A panel of the Court of Appeals for the Tenth Circuit affirmed, 802 F.2d 1203 (1986), but rehearing en banc was granted limited to the claim concerning the challenged aggravating circumstance.

The en banc court recognized that the jury had found two aggravating circumstances, one of them being unchallenged. But it noted that in cases where a death sentence rested in part on an invalid aggravating circumstance, the Oklahoma courts did not reweigh the aggravating and mitigating circumstances in an effort to save the death penalty; rather, the death sentence was vacated and a life-imprisonment sentence automatically imposed. Oklahoma *1857 had "no provision for curing on appeal a sentencer's consideration of an invalid aggravating circumstance." 822 F.2d 1477, 1482 (1987). It was therefore necessary to consider the vagueness challenge to one of the aggravating circumstances. The court proceeded to do so and unanimously sustained the challenge. It stated that the words "heinous," "atrocious," and "cruel" did not on their face offer sufficient guidance to the jury to escape the strictures of our judgment in *Furman v. Georgia*, [486 U.S. 360] 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Nor, in the court's view, had the Oklahoma courts adopted a limiting construction that cured the infirmity and that was relied upon to affirm the death

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

sentence in this case. It concluded that the Oklahoma Court of Criminal Appeals' construction of the aggravating circumstance was "unconstitutionally vague" under the Eighth Amendment. 822 F.2d, at 1483, 1492. The death sentence, accordingly, was held to be invalid and its execution enjoined, but "without prejudice to further proceedings by the state for redetermination of the sentence on the conviction." *Id.*, at 1492.

Petitioner sought review here of the Tenth Circuit's holding that the aggravating circumstance was unconstitutionally vague. Because of the conflict between the Court of Appeals for the Tenth Circuit and the Court of Criminal Appeals of Oklahoma and because of the importance of this constitutional issue to the orderly and proper administration of state death-penalty statutes, we granted certiorari, limited to that issue. 484 U.S. 1003, 108 S.Ct. 693, 98 L.Ed.2d 645 (1988). We affirm the judgment of the Court of Appeals.

The Court of Appeals, with some care, reviewed the evolution in the interpretation of the "especially heinous, atrocious, or cruel" aggravating circumstance by the Oklahoma Court of Criminal Appeals up to and including its decision in this case. Its reading of the cases was that while the Oklahoma court had considered the attitude of the killer, the manner of the killing, and the suffering of the victim to be relevant and sufficient to support the aggravating circumstance, that court had "refused to hold that any one of those factors *must* be present for a murder to satisfy this aggravating circumstance." 822 F.2d, at 1491. Rather, the Oklahoma court simply had reviewed all of the circumstances of the murder and decided whether the facts made out the aggravating circumstance. *Ibid.* We normally defer to courts of appeals in their interpretation of state law, and we see no reason not to accept the Court of Appeals' statements about [486 U.S. 361] state law in this case, especially since the State does not challenge this reading of the Oklahoma cases.

The State, however, takes issue with the Court of Appeals' conclusion that this approach, which was also employed in this case, to interpreting and applying the challenged aggravating circumstance is unconstitutional. It insists that in some cases there are factual circumstances that so plainly characterize the killing as "especially heinous, atrocious, or cruel" that affirmance of the death penalty is proper. As we understand the argument, it is that a statutory provision governing a criminal case is unconstitutionally vague only if there are no circumstances that could be said with reasonable certainty to fall within reach of the language at issue. Or to put it another way, that if there are circumstances that any reasonable person would recognize as covered by the statute, it is not unconstitutionally vague even if the language would fail to give adequate notice that it covered other circumstances as well.

[1][2][3][4] The difficulty with the State's argument is that it presents a Due Process Clause approach to vagueness and fails to recognize the rationale of our cases construing and applying the Eighth Amendment. Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk. Vagueness challenges to statutes not *1858 threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis. *United States v. Powell*, 423 U.S. 87, 92-93, 96 S.Ct. 316, 319-320, 46 L.Ed.2d 228 (1975); *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975); *Palmer v. City of Euclid*, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971) (*per curiam* ); *United States v. National Dairy Corp.*, 372 U.S. 29, 32-33, 36, 83 S.Ct. 594, 597-598, 599-600, 9 L.Ed.2d 561 (1963). Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must [486 U.S. 362] find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

*Furman* held that Georgia's then-standardless capital punishment statute was being applied in an arbitrary and capricious manner; there was no principled means provided to distinguish those that received the penalty from those that did not. *E.g.*, *id.*, at 310, 92 S.Ct., at 2762-2763 (Stewart, J., concurring); *id.*, at 311, 92 S.Ct., at 2763 (WHITE, J., concurring). Since *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action. *Gregg v. Georgia*, 428 U.S. 153, 189, 206-207, 96 S.Ct. 2909, 2940-2941, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.); *id.*, at 220-222, 96 S.Ct., at 2947-2948 (WHITE, J.,

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

In addition, I fear that the prisoners on death row in Alabama, Delaware, Florida, and Indiana, which the Court identifies as having hybrid sentencing schemes in which the jury renders an advisory verdict but the judge makes the ultimate sentencing determination, see *ante*, at 21, n.6, may also seize on todays decision to challenge their sentences. There are 529 prisoners on death row in these States. Criminal Justice Project, *supra*.

By expanding on *Apprendi*, the Court today exacerbates the harm done in that case. Consistent with my dissent, I would overrule *Apprendi* rather than *Walton*.

---

## FOOTNOTES

Footnote 1

The aggravating circumstances, enumerated in Ariz. Rev. Stat. Ann. 13703(G) (West Supp. 2001), are:

1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

2. The defendant was previously convicted of a serious offense, whether preparatory or completed.

3. In the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense.

4. The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

5. The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.

6. The defendant committed the offense in an especially heinous, cruel or depraved manner.

7. The defendant committed the offense while in the custody of or on authorized or unauthorized release from the state department of corrections, a law enforcement agency or a county or city jail.

8. The defendant has been convicted of one or more other homicides, as defined in 131101, which were committed during the commission of the offense.

9. The defendant was an adult at the time the offense was committed or was tried as an adult and the murdered person was under fifteen years of age or was seventy years of age or older.

10. The murdered person was an on duty peace officer who was killed in the course of performing his official duties and the defendant knew, or should have known, that the murdered person was a peace officer.

---

*Justice OConnor*, with whom the *Chief Justice* joins, dissenting.

I understand why the Court holds that the reasoning of *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000), is irreconcilable with *Walton* v. *Arizona*, 497 U.S. 639 (1990). Yet in choosing which to overrule, I would choose *Apprendi*, not *Walton*.

I continue to believe, for the reasons I articulated in my dissent in *Apprendi*, that the decision in *Apprendi* was a serious mistake. As I argued in that dissent, *Apprendis* rule that any fact that increases the maximum penalty must be treated as an element of the crime is not required by the Constitution, by history, or by our prior cases. See 530 U.S., at 524552. Indeed, the rule directly contradicts several of our prior cases. See *id.*, at 531539
(explaining that the rule conflicts with *Patterson v. New York*, 432 U.S. 197 (1977), *Almendarez-Torres* v. *United States*, 523 U.S. 224 (1998), and *Walton*, *supra*). And
it ignores the significant history in this country of discretionary sentencing by judges. 530 U.S., at 544 (*OConnor*, J., dissenting). The Court has failed, both in *Apprendi* and in the decision announced today, to offer any meaningful justification for deviating from years of cases both suggesting and holding that application of the increase in the maximum penalty rule is not required by the Constitution. *Id.*, at 539.

Not only was the decision in *Apprendi* unjustified in my view, but it has also had a severely destabilizing effect on our criminal justice system. I predicted in my dissent that the decision would unleash a flood of petitions by convicted defendants seeking to invalidate their sentences in whole or in part on the authority of *[Apprendi]. Id.*, at 551. As of May 31, 2002, less than two years after *Apprendi* was announced, the United States Courts of Appeals had decided approximately 1,802 criminal appeals in which defendants challenged their sentences, and in some cases even their convictions, under *Apprendi*.[1] These federal appeals are likely only the tip of the iceberg, as federal criminal prosecutions represent a tiny fraction of the total number of criminal prosecutions nationwide. See *ibid.* (*OConnor*, J., dissenting) (In 1998 federal criminal prosecutions represented only about 0.4% of the total number of criminal prosecutions in federal and state courts). The number of second or successive habeas corpus petitions filed in the federal courts also increased by 77% in 2001, a phenomenon the Administrative Office of the United States Courts attributes to prisoners bringing *Apprendi* claims. Administrative Office of the U.S. Courts, 2001 Judicial Business 17. This Court has been similarly overwhelmed by the aftershocks of *Apprendi*. A survey of the petitions for certiorari we received in the past year indicates that 18% raised *Apprendi*-related claims.[2] It is simply beyond dispute that *Apprendi* threw countless criminal sentences into doubt and thereby caused an enormous increase in the workload of an already overburdened judiciary.

The decision today is only going to add to these already serious effects. The Court effectively declares five States capital sentencing schemes unconstitutional. See *ante*, at 21, n.5 (identifying Colorado, Idaho, Montana, and Nebraska as having sentencing schemes like Arizonas). There are 168 prisoners on death row in these States, Criminal Justice Project of the NAACP Legal Defense and Educational Fund, Inc., Death Row U.S.A. (Spring 2002), each of whom is now likely to challenge his or her death sentence. I believe many of these challenges will ultimately be unsuccessful, either because the prisoners will be unable to satisfy the standards of harmless error or plain error review, or because, having completed their direct appeals, they will be barred from taking advantage of todays holding on federal collateral review. See 28 U.S.C. 2244(b)(2)(A), 2254(d)(1); *Teague* v. *Lane*, 489 U.S. 288 (1989). Nonetheless, the need to evaluate these claims will greatly burden the courts in these five States.

**Footnote 2**

The statute enumerates certain mitigating circumstances, but the enumeration is not exclusive. The court shall consider as mitigating circumstances any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death . 13703(H).

**Footnote 3**

In all criminal prosecutions, the accused shall enjoy the right to a trial, by an impartial jury .

**Footnote 4**

Rings claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge *Almendarez-Torres* v. *United States*, 523 U.S. 224 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See *Apprendi* v. *New Jersey*, 530 U.S. 466, 490491, n.16 (2000) (noting the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation (citation omitted)). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See *Proffitt* v. *Florida*, 428 U.S. 242, 252 (1976) (plurality opinion) ([I]t has never [been] suggested that jury sentencing is constitutionally required.). He does not question the Arizona Supreme Courts authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See *Clemons* v. *Mississippi*, 494 U.S. 738, 745 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See *Apprendi*, 530 U.S., at 477, n.3 (Fourteenth Amendment has not been construed to include the Fifth Amendment right to presentment or indictment of a Grand Jury).

**Footnote 5**

In *Harris* v. *United States*, *ante*, p. __, a majority of the Court concludes that the distinction between elements and sentencing factors continues to be meaningful as to facts increasing the minimum sentence. See *ante*, at 20 (plurality opinion) (The factual finding in *Apprendi* extended the power of the judge, allowing him or her to impose a punishment exceeding what was authorized by the jury. [A] finding [that triggers a mandatory minimum sentence] restrain[s] the judges power, limiting his or her choices within the authorized range. It is quite consistent to maintain that the former type of fact must be submitted to the jury while the latter need not be.); *ante*, at 1 (*Breyer*, J., concurring in part and concurring in judgment) ([T]he Sixth Amendment permits judges to apply sentencing factorswhether those factors lead to a sentence beyond the statutory maximum (as in *Apprendi*) or the application of a mandatory minimum (as here).) .

**Footnote 6**

Of the 38 States with capital punishment, 29 generally commit sentencing decisions to juries. See Ark. Code Ann. 54602 (1993); Cal. Penal Code Ann. 190.3 (West 1999); Conn. Gen. Stat. 53a46a (2001); Ga. Code Ann. 171031.1 (Supp. 1996); Ill. Comp. Stat. Ann., ch. 720, 5/91(d) (West 1993); Kan. Stat.

Ann. 214624(b) (1995); Ky. Rev. Stat. Ann. 532.025(1)(b) (1993); La. Code Crim. Proc. Ann., Art 905.1 (West 1997); Md. Ann. Code, Art. 27, 413(b) (1996); Miss. Code Ann. 9919101 (19732000); Mo. Rev. Stat. 565.030, 565.032 (1999 and Supp. 2002); Nev. Rev. Stat. Ann. 175.552 (Michie 2001); N.H. Rev. Stat. Ann. 630:5 (II) (1996); N.J. Stat. Ann. 2C:113(c) (Supp. 2001); N.M. Stat. Ann. 3120A1 (2000); N.Y. Crim. Proc. Law 400.27 (McKinney Supp. 20012002); N.C. Gen. Stat. 15A2000 (1999); Ohio Rev. Code Ann. 2929.03 (West 1997); Okla. Stat., Tit. 21, 701.10(A) (Supp. 2001); Ore. Rev. Stat. Ann. 163.150 (1997); 42 Pa. Cons. Stat. 9711 (Supp. 2001); S.C. Code Ann. 16320(B) (1985); S.D. Codified Laws 23A27A2 (1998); Tenn. Code Ann. 3913204 (Supp. 2000); Tex. Code Crim. Proc. Ann., Art. 37.071 (Vernon Supp. 2001); Utah Code Ann. 763207 (Supp. 2001); Va. Code Ann. 19.2264.3 (2000); Wash. Rev. Code 10.95.050 (1990); Wyo. Stat. Ann. 62102 (2001).

Other than Arizona, only four States commit both capital sentencing factfinding and the ultimate sentencing decision entirely to judges. See Colo. Rev. Stat. 1611103 (2001) (three-judge panel); Idaho Code 192515 (Supp. 2001); Mont. Code Ann. 4618301 (1997); Neb. Rev. Stat. 292520 (1995).

Four States have hybrid systems, in which the jury renders an advisory verdict but the judge makes the ultimate sentencing determinations. See Ala. Code 13A546, 13A547 (1994); Del. Code Ann., Tit. 11, 4209 (1995); Fla. Stat. Ann. 921.141 (West 2001); Ind. Code Ann. 355029 (Supp. 2001).

**Footnote 7**

We do not reach the States assertion that any error was harmless because a pecuniary gain finding was implicit in the jurys guilty verdict. See *Neder* v. *United States*, 527 U.S. 1, 25 (1999) (this Court ordinarily leaves it to lower courts to pass on the harmlessness of error in the first instance).

## FOOTNOTES

**Footnote 1**

This data was obtained from a Westlaw search conducted May 31, 2002, in the United States Courts of Appeals database using the following search terms: Apprendi v. New Jersey & Title[U.S. or United States].

**Footnote 2**

Specific counts are on file with the Clerk of the Court.

FindLaw RESOURCES

LEGAL NEWS: Top Headlines · Supreme Court · Commentary · Crime · Cyberspace · International
US FEDERAL LAW: Constitution · Codes · Supreme Court Opinions · Circuit Opinions
US STATE LAW: State Constitutions · State Codes · Case Law
RESEARCH: Dictionary · Forms · LawCrawler · Library · Summaries of Law
LEGAL SUBJECTS: Constitutional · Intellectual Property · Crimmins · Labor · more...
GOVERNMENT RESOURCES: US Federal · US State · Directories · more
INTERNATIONAL RESOURCES: Country Guides · Trade · World Constitutions · more...
COMMUNITY: Message Boards · Newsletters · Greedy Associates Boards
TOOLS: Office · Calendar · CLE · Email · FAX · West WorkSpace · FirmSite

Advertising Info · Add URL · Help · Comments · Jobs@FindLaw · Site Map